JAIME GONZALEZ, a/k/a Carlos Ruiz, Plaintiff-Appellee, v. PROFILE SANDING EQUIPMENT, INC., Defendant-Appellant.—JAIME GONZALEZ, a/k/a Carlos Ruiz, Plaintiff-Appellant, v. PROFILE SANDING EQUIPMENT, INC., Defendant-Appellee.

First District (5th Division)   Nos. 1—01—2812, 1—01—3500 cons.

Opinion filed August 16, 2002.

Mullen & Minella, of Chicago (J. Christopher Mullen and Suzanne H. Dvorak, of counsel), for Jaime Gonzalez.

Freeborn & Peters, of Chicago (Daniel J. Voelker and Robert J. Hall, of counsel), for Profile Sanding Equipment, Inc.

JUSTICE GREIMAN delivered the opinion of the court:

This appeal involves the entry of a default judgment for $1.2 million in a personal injury lawsuit filed by the plaintiff, Jaime Gonzalez, against defendant, Profile Sanding Equipment, Inc. Plaintiff filed this lawsuit seeking damages for the loss of his dominant thumb, which allegedly occurred as a result of defendant's negligence in selling and manufacturing a piece of sanding equipment. The complaint was filed on March 19, 1997, and on January 30, 2001, a default judgment was entered against the defendant while the defendant was not represented by counsel. In attempting to vacate this default judgment, the defendant filed a petition under section 2—1301 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2—1301 (West 2000)). Finding that it lacked jurisdiction, the trial court denied that petition. After that, the defendant filed a petition pursuant to section 2—1401 of the Code (735 ILCS 5/2—1401 (West 2000)). After the parties submitted their respective pleadings, the trial court denied that petition as well. Defendant now appeals the court's denial of defendant's section 2—1401 petition in appellate court case number 1—01—2812.

Following judgment, the plaintiff initiated a supplementary proceeding pursuant to section 2—1402 of the Code (735 ILCS 5/2—1402 (West 2000)) in the form of citations to discover the assets of the defendant. During the course of those proceedings, the plaintiff filed a motion pursuant to section 2—1402 of the Code (735 ILCS 5/2—1402 (West 2000)) for a turnover of assets. That motion requested that, to satisfy the underlying judgment, the trial court deliver to the plaintiff the asset of the potential cause of action of the defendant against its attorneys based on the attorneys' alleged misconduct in the underlying trial. That motion was denied by the trial court on August 22, 2001, and plaintiff now appeals that decision in appellate court case number 1—01—3500. On April 2, 2002, this court consolidated the appeals, and for the reasons that follow, we affirm.

On September 23, 1996, the plaintiff and his cousin were employed by Chicago Audio Group, Inc. (Chicago Audio), a company that manufactures speaker stands. According to the allegations in the complaint, the defendant designed, manufactured, and sold to Chicago Audio a wood cutting and sanding machine known as a Profilematic. The Profilematic requires two employees to operate it. One of the employees, known as the "feeder," inserts wood into the sander while the second employee, known as the "unloader," is responsible for unloading the finished product from the Profilematic and placing the

materials on a cart. Plaintiff usually operated as the unloader while his cousin usually operated as the feeder. At the time of the injury, however, plaintiff was feeding wood into the machine when his thumb became caught in the conveyor belt and was cut off.

The time line of events, as evidenced by the record, was as follows:

- March 19, 1997: Plaintiff filed his product liability action.
- April 2, 1997: Plaintiff obtained service on the defendant.
- July 21, 1997: Plaintiff filed his first motion for default judgment against the defendant, which was granted and transferred for a prove-up.
- August 4, 1997: At the prove-up hearing, counsel appeared on behalf of the defendant and moved to vacate the default judgment, which was allowed. Thereafter, the case was transferred back to the motion court.
- August 22, 1997: While being represented by Seyfarth, Shaw, Fairweather & Geraldson,[1] the defendant filed its appearance and answer 11 days after the deadline the trial court had set.
- September 9, 1997: Trial court issued a case management order requiring written discovery to be completed by December 23, 1997.
- December 8, 1997: Plaintiff propounded his written discovery to the defendant.
- April 7, 1998: Defendant failed to appear for a case management conference. Order of court required the defendant to appear at the next status call or be defaulted.
- May 22, 1998: Plaintiff and defendant failed to appear at case management call and the case was dismissed for want of prosecution. Plaintiff moved to vacate that dismissal on the basis of unintentional mistake, and that motion was granted on June 3, 1998.
- June 3, 1998: Order of court again required the defendant to appear at next case management conference on June 17, 1998.
- June 17, 1998: Defendant again failed to appear and, as of that time, had not responded to plaintiff's written discovery request. Order of court granted default judgment and transferred the case for prove-up.
- July 13, 1999: Plaintiff brought a motion to assign the case to the prove-up call after, apparently, no date was ever assigned for a prove-up. Order of July 26, 1999, assigns the case for prove-up to August 17, 1999.
- July 28, 1999: Prior to prove-up, the plaintiff brought a motion to amend the complaint due to the name change of the plaintiff.

---

[1]Apparently, the lead counsel changed firms during the pendency of this action so that during the proceedings, the defendant was represented by three different law firms.

That motion was granted, and the court ordered the plaintiff to re-serve the defendant with the newly filed complaint. The court also vacated the default judgment.

- September 24, 1999: Plaintiff served summons on the defendant.
- December 8, 1999: Plaintiff again brought a motion for default judgment based on the defendant's failure to appear or answer the amended complaint. Now represented by Schwartz & Freeman, defendant was allowed to file its appearance on that date. The court's order required the defendant to answer or plead by January 5, 2000, and set the trial date of December 7, 2000.
- December 20, 1999: Defendant filed its answer to the amended complaint.
- January 10, 2000: Plaintiff again propounded his written discovery to the defendant.
- May 26, 2000: Plaintiff again brought a motion for default judgment when defendant again failed to participate in discovery. Based on the history of the case, the court denied the motion for default judgment, but barred the defendant from presenting any evidence at trial.
- September 8, 2000: Counsel for the defendant was allowed to withdraw, and no substitution was made.
- December 6, 2000: Case was continued for trial on January 18, 2001.
- December 13, 2000: Plaintiff filed and served a request to admit to the defendant, which was never answered.
- January 15, 2001: Plaintiff served notice of his waiver of his jury demand on the defendant.
- January 16, 2001: Plaintiff took the evidence deposition of his engineering expert, Joseph Leane, with notice to the defendant. Defendant, however, declined to participate.
- January 18, 2001: Defendant failed to appear on trial date. Plaintiff, however, was engaged in another trial and requested a short continuance. The trial date was continued to January 28, 2001.
- January 30, 2001: Case assigned for trial, and defendant failed to appear. Trial court defaulted the defendant and conducted a prove-up which resulted in a judgment entered in the plaintiff's favor.
- March 2, 2001: Thirty-one days after judgment had been entered, now represented by Freeborn & Peters, defendant filed a petition to vacate the judgment under section 2—1301. However, counsel for defendant did not file an appearance in the matter until March 14, 2001.
- April 16, 2001: Trial court denied the defendant's section

2—1301 petition to vacate due to a lack of jurisdiction. The court allowed a briefing of whether the defendant could demonstrate that it had meritorious defenses in order to determine if there was a just reason to vacate the default judgment. Specifically, the court entertained defendant's contention that defendant had intended to file its section 2—1301 petition earlier but for the inattentive conduct of the court's staff. However, the court denied the petition.

• May 2, 2001: Defendant filed a petition to vacate the judgment pursuant to section 2—1401.

• June 22, 2001: After hearing the evidence defendant presented, trial court denied defendant's section 2—1401 petition.

• July 13, 2001: Defendant filed its notice of appeal of the June 22, 2001, order.

Following the judgment, the plaintiff initiated citation proceedings in the same action to discover the assets of the defendant to satisfy the judgment. In those proceedings, plaintiff brought a motion for turnover, which requested that the trial court deliver to the plaintiff the judgment of the asset of the potential cause of action of defendant against its attorneys based on its attorneys' alleged misconduct in the underlying action. That motion was denied in a written ruling where the trial court held, in pertinent part:

"Plaintiff argues that the commercialization concerns surrounding assignments are not present in the instant case since the authorization he seeks only occurs after court intervention pursuant to [section 2—1401(c)(6)]. That provision allows judgment creditors to maintain actions against persons indebted to the judgment debtor only 'upon proof satisfactory to the court.' The negative implications of the attorney-client relationship are, however, still very present in the relief that plaintiff seeks. In fact, the instant motion seeks authorization to bring a legal malpractice claim on behalf of a satisfied client. Plaintiff would likely receive no cooperation from defendant in prosecuting a claim. Additionally, defendant's counsel would be placed in the untenable position of defending a legal malpractice claim without being able to disclose communications with the client. What if defendant specifically authorized all those actions that plaintiff maintains fell below the standard of care? Defendant's counsel would be unable to mention this fact without explicit waiver of the attorney-client privilege by defendant."

Thereafter, the plaintiff filed his notice of appeal of the trial court's denial of his motion for the turnover of assets.

■ Defendant's argument on appeal is that the trial court erred in denying its section 2—1401 petition to vacate the default judgment against it. The law in Illinois regarding section 2—1401 petitions is well established:

"To be entitled to relief under section 2—1401, the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim, (2) due diligence in presenting this defense or claim to the circuit court in the original action, and (3) due diligence in filing the section 2—1401 petition for relief. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21, 499 N.E.2d 1381, 1386 (1986). The quantum of proof necessary to sustain a section 2—1401 petition is a preponderance of the evidence. *Smith*, 114 Ill. 2d at 221, 499 N.E.2d at 1386. A section 2—1401(a) petition must be supported by affidavit or other showing of matters not contained in the record. 735 ILCS 5/2—1401(b) (West 2000); *Cruz v. Columbus-Cuneo-Cabrini Medical Center*, 264 Ill. App. 3d 633, 639, 636 N.E.2d 908, 911 (1994). The question of whether a section 2—1401 petition should be granted lies within the sound discretion of the circuit court, depending upon the facts and equities presented. *Smith*, 114 Ill. 2d at 221, 499 N.E.2d at 1386. A court of review is justified in disturbing the judgment of the circuit court only if it finds that the court abused its discretion. *Smith*, 114 Ill. 2d at 221, 499 N.E.2d at 1386; *American Ambassador Casualty Co. v. Jackson*, 295 Ill. App. 3d 485, 492, 692 N.E.2d 717 (1998). The trial court cannot be said to have abused its discretion if reasonable persons could differ as to its decision. *Merchants Bank v. Roberts*, 292 Ill. App. 3d 925, 930, 686 N.E.2d 1202 (1997)." *Johnson v. Wal-Mart Stores, Inc.*, 324 Ill. App. 3d 543, 547 (2001).

In addition to these elements, Illinois courts have held that the purpose of section 2—1401 is to relieve a diligent party of an unjust decision. Accordingly, the trend in Illinois is to relax that standard where necessary to prevent the unjust entry of default judgments and to effect substantial justice. See *Kulikowski v. Larson*, 305 Ill. App. 3d 110, 114 (1999); *American Ambassador Casualty Co. v. Jackson*, 295 Ill. App. 3d 485, 489 (1998); *Malkin v. Malkin*, 301 Ill. App. 3d 303, 320 (1998). However, a petitioner's lack of due diligence may be excused only under extraordinary circumstances. *Community 1st Credit Union v. Boswell*, 302 Ill. App. 3d 739, 744 (1999), citing *American Ambassador*, 295 Ill. App. 3d at 489.

Here, defendant asserts that it exercised the requisite level of diligence in defending itself at trial and that it has satisfied the other requirements, thus necessitating a reversal of the trial court's June 22, 2001, order. Alternatively, defendant argues that even if this court should find that it did not comport with its due diligence requirements, this court should still reverse the trial court's order to prevent manifest injustice.

As it did before the trial court, defendant first argues that it was

diligent in making several reasonable attempts to obtain a hearing date to file its section 2—1301 petition with the clerk of the circuit court. For this, it points to the affidavit of Brian Messiah (Messiah), defendant's counsel's clerk, where Messiah states that he attempted to obtain a hearing date from Judge Kowalski's clerk in order to timely file defendant's section 2—1301 petition on three separate occasions. However, as Messiah states in his affidavit, he was unable to obtain a hearing date because either Judge Kowalski's staff had left for the day (even though it was during normal business hours) or had left for lunch. After Messiah was able to obtain a hearing date, he filed the section 2—1301 petition on March 2, 2001, at 9:56 a.m., only one day beyond the 30-day deadline prescribed by section 2—1301. Accordingly, defendant asserts, "but for the trial court's clerk['s] unavailability, [defendant] would never have been forced to file its section 2—1401 petition." Defendant concludes that the trial court's "arbitrary refusal" to consider these factors violated "well-settled principles of law involving fairness, equity and substantial justice," and constitutes an abuse of the trial court's discretion.

Defendant also claims that, while not perfect, it has acted with the requisite amount of diligence in defending itself. Specifically, it notes that it responded to plaintiff's initial, March 19, 1997, complaint on August 22, 1997. It also notes that on December 9, 1999, after obtaining leave of court to respond to plaintiff's amended complaint, it filed its answer and affirmative defenses on December 20, 1999.

Moreover, it asserts that plaintiff himself has not acted with clean hands in the resolution of this matter. Specifically, defendant notes that on May 22, 1998, the lawsuit was dismissed for want of prosecution because plaintiff failed to appear at a case management conference. In addition, the record demonstrates that after a default judgment was entered on June 17, 1998, this matter was dormant for one year until July 13, 1999, when plaintiff filed a motion to assign to prove-up call and schedule for prove-up. Accordingly, for the period of one year, plaintiff failed to prosecute his case against defendant, resulting in a self-imposed delay for which, the defendant claims, it cannot be blamed. Overall, defendant asserts, it has remained in control of its case to present its defense to the allegations as set forth in plaintiff's complaint.

As to the requirement of the existence of meritorious defenses, defendant asserts that it only needs to show that it has meritorious defenses rather than prove those defenses. In fact, defendant argues, it "need only assert sufficient facts which, if believed by the trier of fact, would defeat the plaintiff's claim." *Pirman v. A&M Cartage, Inc.*, 285 Ill. App. 3d 993, 1001 (1996). Under that standard, defendant as-

serts that the facts demonstrate that it has five meritorious defenses to the allegations contained in plaintiff's amended complaint.

First, defendant claims that it would have been proven at trial that plaintiff's own negligence significantly contributed to the accident and injuries at issue. Defendant asserts that the facts would also show that the plaintiff would be barred from recovering any damages because plaintiff's fault exceeds more than 50% of the proximate cause of the injuries for which he seeks compensation. See 735 ILCS 5/2—1116 (West 2000). These facts, defendant asserts, can be gleaned from the affidavit of Mr. Jose Aybar (Aybar), who was the production manager for Chicago Audio at the time of the incident. In that affidavit, Aybar asserts that plaintiff never received any formal training as to how to feed wood into the Profilematic, yet chose to do so anyway. That choice, defendant claims, shows that plaintiff failed to act as a reasonable person would under the same or similar circumstances. "Indeed, a reasonable person would have simply refused to *** operate a dangerous piece of machinery without receiving the requisite training."

Second, defendant argues that facts revealed at trial would show that plaintiff assumed the risk when he chose to operate the Profilematic. Defendant notes that the Profilematic is a sanding and woodcutting machine that is used to cut wood in order to make wooden speaker boxes. As such, defendant claims, "a reasonable person would conclude that the Profilematic, by its own nature, is a very dangerous piece of equipment which could cause serious injuries if misused." Nevertheless, in spite of the inherent danger of the machine, plaintiff chose to operate it. Therefore, defendant argues, it is reasonable to conclude that plaintiff's own conduct contributed to the accident and resulting injuries.

Third, defendant asserts that it would have shown at trial that plaintiff's injuries were caused by his own failure to receive adequate instruction and training. For this, defendant again points to the affidavit of Mr. Aybar. There, defendant claims, it is demonstrated that plaintiff never received any type of instruction from Chicago Audio as to how to feed wood into the Profilematic. As a result of plaintiff's failure to receive any instruction on this matter, defendant argues, plaintiff "clearly lacked the requisite training and knowledge of how to operate the Profilematic." Such a lack of knowledge, defendant concludes, clearly contributed to the plaintiff's injuries and should operate to reduce his recovery.

Fourth, defendant asserts that it would have shown at trial that the plaintiff's cousin's negligence contributed to the accident. For this, it notes that plaintiff's cousin worked as the feeder for the machine

the majority of the time and, thus, understood and appreciated the dangerous nature of the machine. However, despite the risks inherent with the Profilematic, he still elected to switch positions with the plaintiff, whom plaintiff's cousin knew was not properly trained to act as a feeder. Accordingly, defendant argues that such behavior on the part of plaintiff's cousin constituted negligence that also contributed to the plaintiff's injuries and should operate to reduce the plaintiff's recovery.

Fifth, defendant argues that it would have shown at trial that the Profilematic machine was also completely safe. For this, defendant notes that plaintiff has failed to provide any evidence as part of the record to show that the Profilematic machine was designed without due regard to any applicable government and industry standards. Accordingly, as another meritorious defense, defendant asserts that the Profilematic machine was safe for its intended use.

■ As to the diligence requirement for the filing of its section 2—1401 petition, defendant notes that on May 2, 2001, just over two weeks after its section 2—1301 motion was denied, it filed its section 2—1401 petition. This, obviously, is within the two-year time period allotted by section 2—1401 and constitutes due diligence. Because plaintiff never challenged this issue during the proceedings in the trial court and does not challenge it on appeal, plaintiff has waived this requirement. See *People v. Harvey*, 196 Ill. 2d 444, 447-48 (2001).

■ Although it is true that some decisions have relaxed or even excused the due diligence requirements, courts have only done so in the extraordinary circumstances where it is necessary to prevent an *unjust* entry of default judgment (see, *e.g.*, *Kulikowski*, 305 Ill. App. 3d at 114), or where there is unconscionable conduct by the opposing party that would require that the due diligence requirement be relaxed (see *S.C. Vaughan Oil Co. v. Caldwell, Troutt, & Alexander*, 321 Ill. App. 3d 447, 449 (2001)). Here, defendant has not demonstrated that holding it to the normal requirements of due diligence would result in manifest injustice (see *Sunderland v. Portes*, 324 Ill. App. 3d 105, 111 (2001) (holding that because of the plaintiffs' age, disability, and lack of representation during the two years that passed between the entry of the summary judgment and dismissal orders and the filing of the petition to vacate, it would be manifestly unjust to find a lack of due diligence)), or that plaintiff has engaged in deceptive, unfair, or unjust conduct. Accordingly, we will not relax the due diligence requirement in this case.

In employing the full due diligence requirement, we agree with the plaintiff that a review of the chronological development of this case supports the trial court's conclusion that defendant failed to use

diligence in presenting its case to the trial court in the original action. True, defendant's recent efforts show diligence in attempting to vacate the default judgment, but such actions are irrelevant to whether defendant acted diligently in the original action. Rather, the petitioner must show "that through no fault or negligence of his own, the error of fact or the existence of a valid defense was not made to appear to the trial court." *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 222 (1986).

■ As plaintiff notes, in the present case, defendant hardly participated in the action throughout its nearly four-year life, other than through filing its responsive pleadings as ordered by the trial court. Moreover, it never participated in discovery on the many occasions it was provided so to do. Clearly, the trial court found that the defendant's failure to provide any meaningful participation in the litigation was so egregious that it barred defendant from presenting any evidence at trial. Defendant also did not take advantage of the many opportunities to defend itself, as evidenced by the fact that plaintiff had to bring four default motions over the course of the case. Consequently, defendant cannot seriously contend that it was taken by surprise or had no chance to defend itself. Defendant simply ignored the chances it had to defend itself.

Moreover, defendant's citation of two instances of plaintiff's conduct that resulted in delay are unavailing. With regard to the dismissal for want of prosecution, plaintiff immediately resolved the issue as an inadvertent mistake. With regard to the delay in "proving-up" the case, plaintiff demonstrated his belief that he never received a notice of a prove-up date. Regardless, it is not part of the proper section 2—1401 analysis to evaluate the plaintiff's conduct where it is not flagrant or harmful to the defendant. Accordingly, we find that defendant has not provided adequate facts or support to indicate that it was diligent and, therefore, violated that requirement. Because this is enough to annul defendant's claim on this issue, we could stop our analysis here.

However, upon examination of defendant's alleged meritorious defenses, we find that none of them are sufficient to warrant granting the section 2—1401 petition. As previously mentioned, defendant was barred from presenting any evidence at trial as a punishment for its failure to participate in the case. Accordingly, the defenses that defendant asserts by outside affidavits would, ultimately, be unavailable at trial, since plaintiff has stated that he would not call these witnesses. Therefore, these defenses are meritless.

With regard to the other defenses, the only evidence that defendant would be able to provide at trial would be the cross-examination of the plaintiff. However, as the plaintiff notes, the burden

on the defendant is not to show what its meritorious defenses might be if the testimony turns out a certain way at trial, but to show what facts it can reasonably allege to support its claim that it has a defense. In other words, while it is true that the defendant does not have to prove the facts at present, its allegations still require merit.

In claiming that plaintiff was contributorily negligent, defendant claims that plaintiff never received any formal training on the machine, that he unreasonably chose to switch sides of the machine with his cousin, and that he unreasonably fed a piece of wood into the machine. However, defendant has not shown how any of these acts caused the accident, which is naturally part of the defense.

Moreover, as plaintiff notes, these are not facts that show contributory negligence, as none of these acts are, by themselves, negligent. Because the purpose of the machine was to feed wood into it for sanding, defendant simply complied with regular procedure. Without more, such as an allegation that the plaintiff *improperly* fed the wood into the machine or the ability to show that the machine was safe, defendant cannot allege the existence of a meritorious defense.[2] Thus, defendant's claim fails in this regard as well.

To satisfy the judgment owed by the defendant to the plaintiff as a result of the underlying case, plaintiff, in a supplementary proceeding pursuant to section 2—1402, moved for the turnover of the asset of a possible legal malpractice action by defendant against its counsel for counsel's conduct in the underlying case. Citing Illinois case law, the trial court denied that motion, finding that a legal malpractice action cannot be so transferred to an outside party. In a separate appeal now consolidated with the underlying action, plaintiff asserts that the trial court erred in denying his motion. We hold, for the following reasons, that plaintiff's motion is not authorized by statute or case law.

■ Initially, the parties disagree as to the proper standard of review. Section 2—1402 states, in pertinent part:

"(a) A judgment creditor, or his or her successor in interest when that interest is made to appear of record, is entitled to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor not exempt from the enforcement of the judgment, a deduction order or garnishment, and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment. ***

* * *

---

[2] In fact, in many points in its brief, defendant itself refers to the machine as "dangerous."

(c) When assets or income of the judgment debtor not exempt from the satisfaction of a judgment, a deduction order or garnishment are discovered, the court may, by appropriate order or judgment:

(1) Compel the judgment debtor to deliver up, to be applied in satisfaction of the judgment, in whole or in part, money, choses in action, property or effects in his or her possession or control, so discovered, capable of delivery and to which his or her title or right of possession is not substantially disputed.

\* \* \*

(6) Authorize the judgment creditor to maintain an action against any person or corporation that, it appears upon proof satisfactory to the court, is indebted to the judgment debtor, for the recovery of the debt, forbid the transfer or other disposition of the debt until an action can be commenced and prosecuted to judgment, direct that the papers or proof in the possession or control of the debtor and necessary in the prosecution of the action be delivered to the creditor or impounded in court, and provide for the disposition of any moneys in excess of the sum required to pay the judgment creditor's judgment and costs allowed by the court." 735 ILCS 5/2—1402 (West 2000).

Plaintiff notes that the legislature specifically listed those items in subsection (c)(1) which the court may compel to be delivered up. Those items specifically include "choses in action"; however, there is no language in the statute that circumscribes which choses may be delivered. Accordingly, plaintiff argues that the trial court's determination is an interpretation of the statute that is not justified. And, as plaintiff argues, statutory construction is a question of law, and a reviewing court will interpret a statute pursuant to its own judgment, independent of, and not deferential to, that of the trial court. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12 (1996).

Defendant, however, asserts that the trial court's decision to transfer any "choses in action" under section 2—1402 is discretionary because it provides that the court "may" transfer a chose in action. Defendant asserts that the legislature's use of the word "may" is an indication that the legislature wanted to leave this decision to the discretion of the trial court, where the legislative use of the word "may" is permissive rather than mandatory. See *In re Marriage of Freeman*, 106 Ill. 2d 290, 298 (1985). As such, defendant argues, this court may not overturn the decision of the trial court absent an abuse of that court's discretion.

■ In prior cases, this court has found that "[t]he use of the word 'may' signals a legislative intent to vest the trial court with discretion in awarding relief." *Buckner v. Causey*, 311 Ill. App. 3d 139, 150 (1999).

See also *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 304 (2001), citing *In re Marriage of Smith*, 114 Ill. App. 3d 47, 49 (1983); *In re Estate of Ahmed*, 322 Ill. App. 3d 741, 744, 746 (2001) (holding that the consistent and exclusive use of the term "may" indicates that the court is not required to grant requests made by a party but may do so within its discretion); *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 523 (2001); *People v. Markwart*, 327 Ill. App. 3d 80, 91 (2001). "As in other matters committed to the discretion of the trial court, we will not reverse in the absence of an abuse of that discretion." *Buckner*, 311 Ill. App. 3d at 150, citing *Boyd v. United Farm Mutual Reinsurance Co.*, 231 Ill. App. 3d 992, 1000 (1992). We are bound by this precedent and reject plaintiff's argument on this issue.

Substantively, plaintiff asserts that where a statute is clear and unambiguous, the court should not look to extrinsic aids for construction. See *Lawrence v. Regent Realty Group, Inc.*, 197 Ill. 2d 1, 10 (2001), citing *Board of Education of Rockford School District No. 205 v. Illinois Educational Labor Relations Board*, 165 Ill. 2d 80, 87 (1995). Plaintiff also notes that a statute must be enforced as written, and a court may not depart from the statute's plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature. *Lawrence*, 197 Ill. 2d at 10, citing *People v. Wright*, 194 Ill. 2d 1, 29 (2000). In other words, the court must create neither rights nor limitations unless the court infers them from statutory language. *Lemont-Bromberek Combined School District No. 113(a) v. Walter*, 279 Ill. App. 3d 847, 850 (1996). Statutes " 'should not be rewritten by a court to make them consistent with the court's idea of orderliness and public policy.' [Citation.]" *Walter*, 279 Ill. App. 3d at 850. Indeed, plaintiff concludes, the public policy of a state is to be found embodied in its constitution and its statutes and, only if they are silent, in the decisions of its courts. *Wohl v. Wohl*, 28 Ill. App. 3d 298, 301 (1975).

Here, plaintiff asserts that the language of section 2—1402 clearly and unequivocally states that a trial court may turn over a chose in action to a creditor. According to Black's Law Dictionary, a "chose" has any of three definitions:

> "1. A proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort. 2. The right to bring an action to recover a debt, money, or thing. 3. Personal property that one person owns but another person possesses, the owner being able to regain possession through a lawsuit.—Also termed *thing in action*." Black's Law Dictionary 234 (7th ed. 1999).

Consequently, plaintiff asserts that by the very nature of its definition, a "chose in action" includes a legal malpractice action, *i.e.*, the right

to recover damages from one's attorney for his tort or omission of duty. Moreover, plaintiff argues, there is simply no statutory provision within or outside section 2—1402 that exempts a legal malpractice action from the category of "choses in action." Accordingly, plaintiff argues, because there is a sufficient, clear basis for bringing a legal malpractice claim in this case—based on the fact that defendant's counsel allowed an order to be entered barring its client from presenting evidence at trial—the trial court erred in not turning over this potential cause of action to the plaintiff.

We note the remainder of the definition of "chose" according to Black's law dictionary:

> " 'Chose, or, thing in action is, when a man hath cause, or may bring an action for some duty due to him; as an action of debt ... and because they are things whereof a man is not possessed, but for recovery of them is driven to his action, they are called things in action.' *Termes de la Ley* 85 (1st Am. ed. 1812).

> 'The term *chose in action* has been in common use for a long time, but some doubts have been recently raised as to its precise meaning. (See *Law Quarterly Review* for 1893, 1894, 1895.) A Divisional Court, however, has now given us the following definition: " 'chose in action' " is a known legal expression used to describe all personal rights of property which can only be claimed or enforced by action, and not by taking physical possession.[ ] Torkington v. Magee, [1902] 2 K.B. p. 430. The phrase *"rights of property"* does not seem a very happy one, but it is quite clear that the court meant to include under the term *chose in action* rights under a contract and rights of action arising from breach of contract.' William R. Anson, *Principles of the Law of Contract* 362 n.(b) (Arthur L. Corbin ed., 3d Am. ed. 1919)." Black's Law Dictionary 234 (7th ed. 1999).

In looking at the definition of "chose," we find it akin to an instance where a party has a "cause" for some duty due to him or her, or something similar to "rights" under a contract or a breach of that contract. In other words, it is not potential or inchoate; rather, it is an issue that has been the subject of litigation or, at the very least, is in the process of being litigated. Taking the aforementioned example, if a party to a contract alleges that the contract has been breached, then that party has a chose in action for breach of contract. Similarly, in this case, if the defendant, as the debtor from the underlying judgment, alleged that its counsel's conduct was defective in some manner, it would have a chose of action in legal malpractice. However, where the putative legal malpractice claim has neither been asserted nor commenced by the defendant-debtor, it can only be said that the defendant has a *potential* chose in action.

■ As plaintiff explained, where a statute is clear and unambiguous, this court should not look to extrinsic aids for construction (*Lawrence*, 197 Ill. 2d at 10). Indeed, the statute must be enforced as written, and this court may not depart from the statute's plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature (*Lawrence*, 197 Ill. 2d at 10, citing *Wright*, 194 Ill. 2d at 29). Here, section 2—1402(c)(1) states that the trial court may "[c]ompel the judgment debtor to deliver up, to be applied in satisfaction of the judgment, in whole or in part, money, choses in action, property or effects in his or her possession or control, so discovered, capable of delivery and to which his or her title or right of possession is not substantially disputed." 735 ILCS 5/2—1401(c)(1) (West 2000). Obviously, if the legislature opted to include "potential chose" in the list of possible assets, it would have done so. It did not, and we cannot read that condition into the statute.

Moreover, the statute requires that the chose in question be "capable of delivery and to which his or her title or right of possession is not substantially disputed." 735 ILCS 5/2—1401(c)(1) (West 2000). Here, plaintiff is essentially praying for relief against defendant's counsel without the issue of malpractice ever having been litigated. Clearly, therefore, it could be substantially disputed whether defendant would ever have title to or a right of possession of a chose for legal malpractice where it is unknown if defendant will ever bring such an action. Essentially, the plaintiff is making a prayer for relief based on a presumption that is nothing if not premature. Accordingly, we reject plaintiff's argument that the trial court erred in rejecting his motion.

Further, our holding is supported by case law under these facts. As defendant notes, in *Wilson v. Coronet Insurance Co.*, 293 Ill. App. 3d 992, 994-95 (1997), this court held that because a breach of fiduciary duty claim against an attorney is included within the rubric of a legal malpractice claim, it is not assignable. See also *In re DeMert & Dougherty, Inc.*, 271 B.R. 821, 838-39 (Bankr. N.D. Ill. 2001); 6 Am. Jur. 2d *Assignments* § 65 (1999) (*Wilson* cited as controlling authority in both). Specifically, *Wilson* stated:

"Illinois courts have held that legal malpractice claims are not assignable. *Brocato v. Prairie State Farmers Insurance Ass'n*, 166 Ill. App. 3d 986, 988-89, 520 N.E.2d 1200 (1988); *Clement v. Prestwich*, 114 Ill. App. 3d 479, 480-81, 448 N.E.2d 1039 (1983); *Christison v. Jones*, 83 Ill. App. 3d 334, 338-39, 405 N.E.2d 8 (1980). But see *McGill v. Lazzaro*, 62 Ill. App. 3d 151, 379 N.E.2d 16 (1978) (stating, in *dicta*, that an action in professional negligence survives an attorney's death because such an action would be assignable). The reason stems from the nature of the attorney-client relation-

ship and public policy. The fiduciary relationship between an attorney and client is a personal and confidential one, requiring the attorney to exercise 'the utmost degree of fidelity, honesty and good faith.' See *Christison*, 83 Ill. App. 3d at 338. Illinois courts have reasoned that a malpractice suit is not appropriately brought by a stranger to that relationship and that allowing such assignments would commercialize legal malpractice suits, 'debase the legal profession,' ' "place an undue burden on *** the legal profession [and] judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client." ' *Christison*, 83 Ill. App. 3d at 339, quoting *Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397, 133 Cal. Rptr. 83, 87 (1976)." *Wilson*, 293 Ill. App. 3d at 994-95.

Moreover, in *Clement v. Prestwich*, 114 Ill. App. 3d 479 (1983), the court expressly rejected the plaintiff's contention that a legal malpractice action was assignable based on public policy grounds:

"The attorney-client relationship is a fiduciary relationship as a matter of law. (*In re Schuyler* (1982), 91 Ill. 2d 6, 11, 434 N.E.2d 1137.) This relationship is a confidential one which must be highly honored and guarded by the attorney. (*Rose v. Frailey* (1957), 10 Ill. 2d 514, 517, 140 N.E.2d 711; *Christison v. Jones* (1980), 83 Ill. App. 3d 334, 338, 405 N.E.2d 8.) The confidence reposed in an attorney is of a personal nature and cannot be delegated by the attorney without the client's consent. (*Cornelius v. Wash* (1825), 1 Ill. (Breese) 98, 100; *Christison v. Jones* (1980), 83 Ill. App. 3d 334, 338, 405 N.E.2d 8.) A client's claim for malpractice arises from this personal relationship and is a claim that his attorney has breached a personal duty to the client (*Christison v. Jones* (1980), 83 Ill. App. 3d 334, 338, 405 N.E.2d 8), and that the client has been injured as a result of the breach. (*Pelham v. Griesheimer* (1982), 92 Ill. 2d 13, 18, 440 N.E.2d 96; *Cook v. Gould* (1982), 109 Ill. App. 3d 311, 314, 440 N.E.2d 448.) We believe that sound public policy prohibits the assignment of these claims since an assignee would be a stranger to the attorney-client relationship, who was owed no duty by the attorney and who suffered no injury from the attorney's actions." *Clement*, 114 Ill. App. 3d at 480-81.

In response, plaintiff cites cases that have found that legal malpractice actions *are* assignable and may be pursued by third parties. See *McGill v. Lazzaro*, 62 Ill. App. 3d 151 (1978); *Jones v. Siesennop*, 55 Ill. App. 3d 1037 (1977); *Beastall v. Madson*, 235 Ill. App. 3d 95 (1992). We find them inapposite to the present situation. As the court in *Clement* found with respect to *McGill* and *Siesennop*:

"The issues decided in those cases were that an action for professional negligence does not abate with the death of the attorney [citation], and that an action for professional negligence against an attorney does not abate with the death of the plaintiff and may be pursued by the administrator of her estate. [Citation.] The secondary basis of decision in *McGill*, that legal malpractice claims are assignable, was only briefly analyzed by the court and is not persuasive." *Clement*, 114 Ill. App. 3d at 481-82.

In that same vein, *Beastall* held that a legal malpractice action survived a client's death and that the executor of the client's estate had standing to sue for legal malpractice, regardless of whether the client had filed an action prior to her death. *Beastall*, 235 Ill. App. 3d at 99. None of these cases, we hold, are relevant to the facts present here.

We think that this court has made its position clear on the issue of an attorney's liability to third parties. Moreover, as the trial court pointed out, "the negative implications of the attorney-client relationship are, however, still very present in the relief that plaintiff seeks." What if defendant specifically authorized the conduct that plaintiff alleges was negligent? The trial court shrewdly noted that "[d]efendant's counsel would be unable to mention this fact without explicit waiver of the attorney-client privilege by defendant." In fact, as the trial court also noted, it is possible that plaintiff's motion seeks authorization to bring a legal malpractice claim on behalf of a satisfied client. In light of these concerns, we are unwilling to adopt plaintiff's position.

For the foregoing reasons, we hold the defendant to the normal requirements of due diligence. In so doing, we find that defendant did not comport with those requirements and, thus, the trial court was correct in denying its section 2—1401 petition. Moreover, because plaintiff's section 2—1402 motion to turn over the asset of a potential legal malpractice action is not authorized by statute or case law, we affirm the trial court on this decision as well.

Affirmed.

CAMPBELL, P.J., and QUINN, J., concur.