**SECOND DIVISION**
**MARCH 31, 2006**

No. 1-05-1426

| | | |
|---|---|---|
| BRIAN DOWLING, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee and | ) | Cook County. |
| Judgment Creditor, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 96 CH 4430 |
| CHICAGO OPTIONS ASSOCIATES, INC., and | ) | |
| MICHAEL E. DAVIS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Supplementary Proceedings Against DLA | ) | The Honorable, |
| Piper, Rudnick, Gray, Cary, (US), LLP, | ) | Mary Anne Mason, |
| | ) | Judge Presiding. |
| Third-Party Citation Respondent | ) | |
| and Appellant). | ) | |

PRESIDING JUSTICE GARCIA delivered the opinion of the court.

This appeal comes to us from supplementary proceedings instituted by the plaintiff, Brian Dowling, against DLA Piper, Rudnick, Gray and Cary, LLP (Piper Rudnick). Dowling instituted the supplementary proceedings to enforce judgments entered against Piper Rudnick's client, Michael Davis, which totaled $817,830.45. On appeal, Piper Rudnick argues that the circuit court exceeded its authority when it ordered Piper Rudnick to turn over the retainer funds deposited by Davis in anticipation of legal services.

BACKGROUND

In May and October 2002, the circuit court entered judgments totaling $817,830.45, in favor of Dowling and against Davis. These judgments became final and enforceable on February 28, 2003.

On February 26, 2003, Piper Rudnick began its representation of Davis and his wife and an engagement letter was signed, stating in pertinent part:

"Re: Client Engagement; 308813-000020

Dear Michael and Emily:

We are pleased to have the opportunity to represent you regarding your purchase of a home in Florida and to give you general advice regarding asset protection.

* * *

We customarily send monthly invoices for services rendered and other charges incurred for your account during the previous month. The monthly invoice details the work performed and the types of charges incurred. Payment will be due thirty (30) days after the date of our invoice. ***

You have authorized us to allocate $100,000 of the cash on hand as a retainer. These funds will be applied toward payment of

1-05-1426

the final monthly invoice containing entries
with respect to the above-referenced matter
and will be subject to repayment by us if the
amount of our fees for work done and costs
incurred that remain unpaid do not equal the
amount of the retainer then held by us.
Under such circumstances, the balance of the
retainer would then be returned to you when
our representation of you on this matter
ceases.

* * *

Finally, I remind you that we are taking
very aggressive positions to attempt to
protect your assets and satisfy your related
concerns.  These positions are likely to be
attacked in litigation in Florida or
Illinois.  While we believe that our advice
will, more likely than not, be upheld in
court, given the animosity between you and
the judgment creditor, litigation is a
virtual certainty."

On March 19, 2003, Davis and his wife transferred
$100,094.72 to Piper Rudnick from their Bank of America bank
account (the March 2003 retainer funds).  Between March 19, 2003,
and July 10, 2003, Piper Rudnick applied $12,518.19 of the March

3

2003 retainer funds to bill numbers 1358074, 1365234, 1384802, and 1395768.  These bills covered work Piper Rudnick performed in connection with the purchase of Davis's home in Florida.

In September 2003, Dowling instituted supplementary proceedings against Davis and issued citations to discover assets and turnover orders to third parties.  On October 17, 2003, Dowling issued a citation to discover assets to "Piper Rudnick LLP Trust."  The citation was based on a document received by Dowling's attorneys from North Shore Community Bank and Trust Company (North Shore Bank).  The document identified a wire transfer, dated February 18, 2003, which showed  $1,580,506.86, flowing from an account held by "Michael Davis, a.k.a. 4637 Manor LLC" to "Piper Rudnick LLP Trust" account number 1405360564.  A note written by Dowling's attorney to Piper Rudnick on October 28, 2003, stated that, "[t]his appears to be a transfer of funds made by Michael E. Davis to a bank in Florida with the intent of avoiding payment of our judgment."  On November 10, 2003, Piper Rudnick applied $9,496.71 of the March 2003 retainer funds to bill number 1439429, for services provided in connection with Dowling's supplementary proceedings.

On November 20, 2003, attorney Gerald B. Lurie (Attorney Lurie) of Piper Rudnick appeared in response to Dowling's motion and represented that Piper Rudnick was holding no funds in its trust account for Davis.  There is no transcript from the November 2003 hearing; however, there is a written order

4

reflecting that the circuit court denied Dowling's motion as moot, stating: "(2) [The] plaintiff's motion for turnover order directed to Piper Rudnick LLP is denied as moot, on Piper Rudnick LLP's representation that it holds no money in its trust account belonging to Davis."

On November 21, 2003, Attorney Lurie delivered records reflecting activity on Davis's Bank of America account from which the March 2003 retainer funds had been paid to Piper Rudnick. On December 3, 2003, Piper Rudnick applied $19,699.08 of the March 2003 retainer funds balance to bill number 1452051, dated December 3, 2003, for services provided to resist Dowling's efforts to reach Davis's assets.

On December 9, 2003, Davis appeared for his citation examination. During Davis's examination, Dowling's attorney and Davis's attorney discussed the March 2003 retainer funds that had been paid to Piper Rudnick. Dowling's attorney opined that Attorney Lurie had made a misrepresentation to the circuit court in November 2003, when he asserted that Piper Rudnick held no money in its trust account for Davis. Dowling's attorney opined that the available balance of the retainer as of October 27, 2003, the date Dowling issued a citation to discover assets to Piper Rudnick, should have been disclosed pursuant to the citation. Davis's attorney maintained that the remaining retainer funds were not Davis's property. In pertinent part, the conversation between Dowling's attorney, Daniel J. Voelker

(Attorney Voelker), and Attorney Lurie was as follows:

"[Attorney Voelker]: I guess I am confused because your [Davis's] lawyers have gone on record and said they do not hold any money as a retainer for you, but you're saying they do?

[Attorney Lurie]: Well, wait a minute.

[Attorney Voelker]: That is what your letter said to me.  That is what you represented to the Court.  That you...

[Attorney Lurie]: I said we didn't hold any money that was owing to Mr. Davis.

[Attorney Voelker]: We asked for a turnover of any money you have on retainer.

[Attorney Lurie]: No.

[Attorney Voelker]: Yeah, we did.  I'm sure we did.

[Attorney Lurie]: No, you did not.  Any money on retainer is all we...

[Attorney Voelker]: We have a major problem here.

[Attorney Lurie]: We may have a disagreement.

[Attorney Voelker]: I think you have misrepresented your situation to the Court.

[Attorney Lurie]: I said we were not holding any funds that were due to Mr. Davis.

[Attorney Voelker]: If it is a retainer and it isn't earned it is due to him. It is an advanced retainer. It is our money.

[Attorney Lurie]: I don't think so.

[Attorney Voelker]: So we'll resolve that issue.

[Attorney Lurie]: I agree, but don't say I misrepresented...

[Attorney Voelker]: I think you did. I have a right to my opinion. I think you did.

[Attorney Lurie]: You sure do.

[Attorney Voelker]: We'll take immediate action on it.

* * *

[Attorney Lurie]: You said that I told the Court we weren't holding any money on retainer. Your motion for a turnover order in your citation were in issue to Piper Rudnick's trust account. We have no money in a trust account for Mr. Davis. Our trust account was cleared of any funds owed to Mr. Davis in March. The money that we are holding as a retainer that is held in our

7

account is not segregated...

      [Attorney Voelker]: You tell that story to the judge.  If you look at the citation...

      [Attorney Lurie]: Fine.  I just want to make it clear to you.

      [Attorney Voelker]: Well, I think the judge is who you are going to have to make it clear to.  Because we are going to make a motion for contempt.

      [Attorney Lurie]: Well, what a surprise.

      [Attorney Voelker]: Well, I would think it would be a surprise."

In 2004, Piper Rudnick applied the March 2003 retainer funds to bill numbers 1461259 ($44,224.11), 1471321 ($5,781.75), 1479806 ($3,241.24), 1490054 ($5,133.64) issued between January and April 2004.  The referenced bills were for services provided to Davis to resist Dowling's efforts to reach Davis's assets.  At this point, the $100,094.72 retainer was exhausted.

On June 8, 2004, the citation to discover assets pending against Davis since September 2003 was dismissed.  The circuit court, however, gave Dowling leave to issue a second citation to Davis.  On June 8, 2004, Davis's wife transferred $50,000 to Piper Rudnick (the June 2004 retainer funds).  On June 25, 2004, Dowling served Davis with second citation to discover assets. Between June and August 2004, Piper Rudnick applied the June 2004

retainer funds to bill numbers 1490054 ($8,525.12), 1503908 ($6,467.61), 1514487 ($6,467.61), 1524795 ($12,433.37), and 1535567 ($5,044.39). Again, Piper Rudnick asserts that these bills were for services provided in connection with Dowling's collection efforts. On August 6, 2004, Dowling also served Piper Rudnick with a second citation to discover assets.

On February 14, 2005, Dowling presented a motion to turn over assets requesting that Piper Rudnick be required to pay him $137,576.53, comprised of the $87,576.53 balance that remained on the March 2003 retainer funds as of October 27, 2003, and the June 2004 retainer funds forwarded to Piper Rudnick from Davis's wife. In his motion and reply, Dowling based his argument, at least partially, on Piper Rudnick's system of identifying the projects it was working on for Davis. Dowling argued that Piper Rudnick's engagement letter to Davis called for a $100,000 retainer for client and matter numbers "308813-000020" dealing with the "purchase of a home in Florida" and "general advice regarding asset protection." Dowling maintained that beginning in November 2003, Piper Rudnick began referring to work done for Davis as client and matter numbers "308813-000001." Dowling averred that the assignment of a new matter number to Piper Rudnick's work concerned its efforts to represent Davis in the supplementary proceedings instituted by Dowling and, thus, were outside the scope of work as outlined in the engagement letter. As such, Dowling maintained that the March 2003 retainer funds

9

should not have been used to cover fees from work that was not outlined in the engagement letter, and should have been identified by Piper Rudnick to the circuit court as funds due Davis. Dowling asked for relief based on sections 2-1402(c)(1), (c)(3), (c)(4), (c)(5), and (f)(1)[1] of the Illinois Code of Civil Procedure. 735 ILCS 5/2-1402(c)(1), (c)(3), (c)(4), (c)(5), (f)(1) (West 2002).

On March 6, 2005, Piper Rudnick answered Dowling's motion

---

[1] In his reply motion to the circuit court, Dowling incorrectly identified section 2-1402(f)(1) as 2-1402(d)(1). Cf. 735 ILCS 5/2-1402(d), (f)(1) (West 2002). However, it is clear from the context of the motion that Dowling's argument was based on section 2-1402(f)(1).

denying that the $87,576.53 balance was Davis's property, and alternatively asserting that the retainer funds were exempt from judgment because the funds were transferred from a bank account held by Davis and his wife as tenants by the entirety. Piper Rudnick maintained that it had not violated any court orders or statutory restraints in accepting and applying the June 2004 retainer funds because they were received from Davis's wife after the supplementary proceedings instituted in September 2003 against Davis had been dismissed, and before a second citation was issued. In a supplementary answer, Piper Rudnick maintained that the initial client and matter numbers were assigned to "general" matters, and the designation of a new matter number in November 2003 specifically related to work on the supplementary proceedings issued against Davis. Piper Rudnick also asserted an affirmative defense, that even if the March 2003 and June 2004 retainer funds were not the property of Piper Rudnick, then they were the property of Davis and his wife as tenants by the entireties, and were therefore exempt from the claims of a creditor of one, but not both, of them.

On April 18, 2005, the circuit court heard argument on Dowling's motion and Piper Rudnick was ordered to turn over $137,576.53 to Dowling. The circuit court's order did not specify on what ground it was granting relief. This appeal followed.

ANALYSIS

11

1-05-1426

I. Standard Of Review

We must first address the parties' disagreement concerning our standard of review.

Piper Rudnick contends that because the circuit court conducted no evidentiary hearing and made no findings of fact, and because we are required to interpret section 2-1402 (735 ILCS 5/2-1402 (West 2002)), we should review this issue de novo. In support of its position, Piper Rudnick provides citation to Northwest Diversified, Inc. v. Mauer, 341 Ill. App. 3d 27, 791 N.E.2d 1162 (2003), and Itasca Bank & Trust Co. v. Thorleif Larsen & Son, Inc., 352 Ill. App. 3d. 262, 815 N.E.2d 1259 (2004). Conversely, Dowling relies on Gonzalez v. Profile Sanding Equipment, Inc., 333 Ill. App. 3d 680, 776 N.E.2d 667 (2002), and asserts that a circuit court's section 2-1402 rulings "are discretionary and should not be overturned absent an abuse of discretion."

The Gonzales court was asked to determine whether a trial court erred when it denied a plaintiff creditor's request that a defendant debtor turn over a potential cause of action against the attorney representing him in an underlying proceeding from which the plaintiff creditor received a judgment. Gonzalez, 333 Ill. App. 3d at 685. In determining the proper standard of review, the Gonzales court agreed with the defendant debtor that the legislature's use of the word "may" in section 2-1402 indicated that the legislature intended "'to vest the trial court

12

with discretion in awarding relief.'" Gonzalez, 333 Ill. App 3d at 692, quoting Buckner v. Causey, 311 Ill. App. 3d 139, 150, 724 N.E.2d 95 (1999). The Gonzalez court went on to cite additional authority that the standard of review of a turnover order under section 2-1402 is an abuse of discretion. We agree: "[w]e are bound by this precedent and reject [the contrary] argument on this issue." Gonzalez, 333 Ill. App. 3d at 693.

In this case we are asked to determine whether the circuit court had the authority under section 2-1402 to enter a turnover order requiring Piper Rudnick to disgorge itself of the balance of the March 2003 and June 2004 retainer funds paid by Davis. To make this determination, we must first consider whether section 2-1402 authorized the circuit court to reach the March 2003 and June 2004 retainer funds given to Piper Rudnick by Davis. This first consideration requires that we interpret section 2-1402, and our review is de novo. Itasca Bank, 352 Ill. App. 3d at 265 (whether section 2-1402 gives a court the authority to order a judgment debtor to resign his country club membership is a question of statutory construction that is reviewed de novo). If we find that section 2-1402 allows the circuit court to reach the retainer funds, we must then determine whether the circuit court abused its discretion in doing so. Gonzalez, 333 Ill. App. 3d at 693.

II. March 2003 and June 2004 Retainer Funds

Piper Rudnick admits that section 2-1402(c)(3) allows the

circuit court to compel a third party to deliver assets belonging to a judgment debtor; however, Piper Rudnick encourages us to focus on the fact that the assets must belong to the judgment debtor. 735 ILCS 5/2-1402(c)(3) (West 2002). Piper Rudnick primarily argues that even if it had divulged it was holding the March 2003 retainer funds, the circuit court could not have ordered a turnover because those funds did not belong to Davis, the judgment debtor, but to Piper Rudnick. Piper Rudnick contends that, based on the parties' contract, i.e., the engagement letter, the only way that Davis could have collected the balance of the retainer funds was if he terminated Piper Rudnick's representation. We note that Piper Rudnick does not provide reference to any case citation or supreme court rule to support its claim. Instead, Davis states that "Illinois courts have held that section 2-1402 itself imposes limitations upon a trial court's authority to order relief" and provides citations to support that contention.

In Itasca Bank, an underlying judgment was entered against Mark Larsen. During proceedings on a citation to discover assets, Itasca Bank learned that Larsen had a membership at the Medinah Country Club (the club). Itasca Bank motioned the trial court to order Larsen to turn over his membership interest in the club, but the trial court denied the motion. Itasca Bank then filed a second motion for turnover requesting that the trial court order Larsen to sell his interest in the club and turn over

14

the resulting profit to Itasca Bank, the trial court again denied the motion. Itasca Bank then filed a third motion and asked the trial court to order Larsen to resign his membership at the club and allow it to be sold. At the hearing on Itasca Bank's third motion, Larsen admitted that resignation of the membership would yield about $17,000, less any amount he owed the club. Nonetheless, the trial court denied the motion finding that it would be an impermissible expansion of section 2-1402. Itasca Bank, 352 Ill. App. 3d at 264.

On appeal, Itasca Bank argued that the trial court erred in concluding that section 2-1402 did not give it the power to reach Larsen's membership interest in the club. The Itasca Bank court noted that no provision in section 2-1402 explicitly authorized an order that would have required Larsen to resign his membership in the club, and commented that "[t]his may mean that the membership, despite not being in the category of assets explicitly exempted from the satisfaction of judgments, is nevertheless beyond [the] plaintiff's reach." Itasca Bank, 352 Ill. App. 3d at 266. The court in Itasca Bank then clarified that although the powers in section 2-1402 had been interpreted expansively, the statute could not be interpreted to allow the trial court to take on powers not listed. The Itasca Bank court then affirmed the trial court's denial of Itasca Bank's motion for turnover, finding that the trial court had no authority to direct Larsen's assets or contract rights in favor of Itasca

15

Bank.  Itasca Bank, 352 Ill. App. 3d at 266-68.

Similarly, in Business Service Bureau, Inc. v. Martin, 306 Ill. App. 3d 907, 911, 715 N.E.2d 764 (1999), the appellate court found that a trial court's order requiring an unemployed judgment debtor to search for a job and keep a record of his efforts was not authorized by section 2-1402.  The appellate court agreed that it was required to liberally construe the language of the supplementary proceeding provisions, but found that under the "clear and unambiguous language" of the statute, no provision for creating or ordering the creation of assets existed.  Business Service Bureau, 306 Ill. App. 3d at 910.

We find neither Itasca Bank nor Business Service Bureau provides any support for Piper Rudnick's argument in this case. In Itasca Bank, the asset being sought, Larsen's membership in the club, had terms and conditions attached to it which the trial court, in its discretion, determined made the asset difficult, if not impossible, to turn over for liquidation.  In Business Service Bureau, the trial court had ordered the debtor to perform an action, i.e., to search for employment that would generate income and allow the creditor to claim a portion of its judgment, which the statute clearly did not allow.  Here, the asset sought for turnover, retainer funds, was readily accessibly because it was a cash asset held in an account by Piper Rudnick and, as of October 2003, partially unearned.  The only issue in this case is whether the unearned retainer funds belonged to Piper Rudnick or

16

1-05-1426

Davis.

In response to Piper Rudnick's arguments, Dowling contends that because the March 2003 retainer fees were unearned, the funds belonged to Davis and he could recoup them without affecting Piper Rudnick's representation. Dowling emphasizes that the parties' engagement letter stated that it was customary for Piper Rudnick to send monthly service invoices to its clients which the clients would then pay by cash or check. In its reply brief, Piper Rudnick gives no credence to Dowling's suggestion that if Davis requested a refund of the retainers' balance, it would not have signaled the end of Piper Rudnick's representation. In fact, in response to Dowling's suggestion, Piper Rudnick commented in a footnote, "[i]f Dowling is serious about this argument *** [he] displays considerable naivete about the economics of a law firm's taking on the representation of a judgment debtor."

We find Piper Rudnick's argument regarding the ownership of th retainer funds to be disingenuous. In response to Dowling's initial citation to discover assets, Piper Rudnick answered that it was not holding any money belonging to Davis. Piper Rudnick had, as evidenced by the wire transfer from North Shore Bank, accepted money from Davis and Manor LLC that was subsequently used to purchase Davis's home in Florida. Later, Davis transferred the March 2003 retainer funds to Piper Rudnick, and when Dowling issued the citation to Piper Rudnick, the March 2003

17

fees were partially unearned.  On Piper Rudnick's representation that it was not holding Davis's money, the circuit court dismissed the citation against Piper Rudnick as moot.  Now, Piper Rudnick asserts that it did not divulge it was holding the March 2003 retainer fund because

> "[it] was not holding, nor had it ever held, any portion of the $100,094.72 retainer it received from Davis *** in its clients' fund account.  To the contrary, the retainer was always held in [Piper Rudnick's] general account."

The account in which Piper Rudnick placed Davis's May 2003 retainer funds is not determinative of Piper Rudnick's obligation to disclose that it held these funds.  In November 2003, Piper Rudnick should have told the circuit court about the March 2003 retainer funds, thereby allowing the circuit court to determine whether these funds could be ordered for turnover.  Instead, Piper Rudnick represented that it held no money in its trust account belonging to Davis, and the circuit court dismissed Dowling's turnover order as "moot."  When, in December 2003, the issue reemerged regarding what funds belonging to Davis were held by Piper Rudnick, motions were filed and arguments were again held.  The result, the April 2005 order by the circuit court instructing Piper Rudnick to turn over $137,576.53 to Dowling. This amount represented the balance of the March 2003 retainer

18

funds, and the June 2004 retainer funds that were transferred to Piper Rudnick after the circuit court had dismissed the citations issued against Piper Rudnick and Davis.  We find the trial court did not abuse its discretion and are unpersuaded by Piper Rudnick's unsupported argument that the unearned retainer funds did not belong to Davis.

                              CONCLUSION

     For the foregoing reasons, the decision of the circuit court is affirmed.

     Affirmed.

     WOLFSON, J., concurs.

     HALL, J., dissents.

     JUSTICE HALL, dissenting:

     I disagree with the majority's determination that the funds held by Piper Rudnick belonged to Mr. Davis and were subject to a turnover order.  The majority overlooks the role of the "retainer" in the relationship of the attorney and client.

     A "retainer" is defined as both "[a] client's authorization for a lawyer to act in a case" and a "fee paid to a lawyer to secure legal representation."  Black's Law Dictionary 1317 (7th ed. 1999).   "A retainer is the act of a client employing an attorney; it also denotes the fee paid by the client when he retains the attorney to act for him."  Carter & Grimsley v. Omni Trading, Inc., 306 Ill. App. 3d 1127, 1130, 716 N.E.2d 320 (1999).  Thus, a retainer is more than a sum of money from which a law firm draws down its fees.  It establishes the employment of

                                19

the attorney by the client.

According to the engagement letter, Mr. Davis and his wife paid Piper Rudnick a $100,000 retainer. The fact that Piper Rudnick could satisfy its fees as earned from this fund does not diminish the fact that the existence of the retainer and various deposits to it signified the relationship of client and attorney between Mr. Davis and his wife and Piper Rudnick.  As such it was the property of Piper Rudnick, subject to the provision that at the end of the representation, any remaining balance would be refunded to Mr. Davis and his wife.

The majority states that the "account in which Piper Rudnick placed Davis's May 2003 retainer funds is not determinative of Piper Rudnick's obligation to disclose that it held these funds."  Slip op. at 17-18.  Again, I disagree.

Rule 1.15 of the Rule of Professional Conduct provides "lawyer shall hold property of clients or third parties that is in a lawyer's possession in connection with a representation separate from the lawyer's own property."  188 Ill. 2d R. 1.15(a).  In the absence of any contention that Piper Rudnick violated the Rules of Professional Conduct by not retaining these funds in a separate account, the fact that they were held in Piper Rudnick's general account establishes that the funds were Piper Rudnick's, subject to reimbursement to the client in the event funds were remaining at the end of the representation.

The majority's decision in this case will have a chilling effect on a person's ability to obtain legal counsel, if

retainers paid to law firms to establish the attorney-client relationship were subject to turnover orders as in this case. Under the decision in this case, where a judgment debtor seeks legal representation in a citation to discover assets proceeding and pays the firm a retainer, the law firm may lose the retainer even before it can commence work on the case. As a practical matter, law firms will be reluctant, understandably, to take on representation of such individuals, thus depriving them of legal representation.

I would conclude that as the funds were the property of Piper Rudnick, Piper Rudnick was correct when it informed the court that it was not holding any funds belonging to Mr. Davis. As a result, the circuit court abused its discretion in ordering Piper Rudnick to turn over the $137,576.53 to Mr. Dowling.

Therefore, I respectfully dissent.

21