2018 IL App (1st) 172976

No. 1-17-2976

Fourth Division
December 20, 2018

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| McGINLEY PARTNERS, LLC, an Illinois Limited Liability Company, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) | Appeal from the Circuit Court of Cook County. |
| v. | ) ) | No. 2014 L 005231 |
| ROYALTY PROPERTIES, LLC, a Florida Limited Liability Company; RICHARD KIRK CANNON, an Individual; and MERYL SQUIRES CANNON, an Individual, | ) ) ) ) ) | The Honorable John C. Griffin, Judge Presiding. |
| Defendants-Appellants. | ) ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal arises from a lawsuit by plaintiff McGinley Partners, LLC, to enforce a note and guaranty executed by defendants Royalty Properties, LLC, Richard Kirk Cannon, and Meryl Squires Cannon in connection with the purchase of a horse farm. The trial court granted summary judgment to plaintiff and entered judgment against defendants in the amount of $8,320,669.43 on February 2, 2017. Nine months after the entry of the judgment, defendants filed a petition to vacate the judgment pursuant to section 2-1401 of the Code of

Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)), alleging that defendants had a meritorious defense to the lawsuit due to the terms of an agreement that plaintiff had failed to disclose during the pendency of the litigation. Defendants further alleged that this agreement came to the attention of defendant Richard Kirk Cannon a month prior to the filing of the section 2-1401 petition. The trial court denied defendants' petition without an evidentiary hearing. For the reasons set forth below, we affirm the trial court's judgment.

¶ 2                                BACKGROUND

¶ 3        The underlying real estate transaction involved in the instant appeal has been considered three times by this court, first in *BMO Harris Bank, N.A. v. Royalty Properties, LLC*, 2016 IL App (1st) 151338-U, followed by *Forest Preserve District v. Royalty Properties, LLC*, 2017 IL App (1st) 171564-U, and *Royalty Farms, LLC v. Forest Preserve District*, 2017 IL App (1st) 161409. Additionally, we recently considered the propriety of the trial court's grant of summary judgment in the instant litigation in *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317. Accordingly, we draw the pertinent facts from our prior decisions.

¶ 4        Defendants Richard and Meryl Cannon owned 43 horses, which resided on a farm in Barrington Hills owned by Horizon Farms, Inc. (Horizon Farms). In 2006, Horizon Farms solicited bids in an effort to sell the farm, and the Cannons submitted a bid of $19.35 million for the property, which was accepted. The Cannons made an earnest money deposit of nearly $2 million and financed the rest of the purchase price, primarily through obtaining a loan of $14.5 million from Amcore Bank in exchange for a mortgage on the property and the personal guaranties of the Cannons. In order to obtain this financing, Amcore Bank required the Cannons to form a limited liability corporation to sign for the loan as the mortgagee.

Accordingly, the Cannons created Royalty Properties, LLC (Royalty Properties), also named as a defendant in the instant litigation. In addition to the financing from Amcore Bank, Horizon Farms, the seller, loaned $1.5 million to Royalty Properties evidenced by a promissory note and secured by a second mortgage on the property. Horizon Farms subsequently assigned its interest in the note and guaranty to the William J. McGinley Marital Trust (trust) upon the dissolution and liquidation of Horizon Farms. On November 10, 2009, the trust assigned all of its right, title, and interest in the note and guaranty to plaintiff McGinley Partners, LLC, the plaintiff in this action. It is this loan that is the subject of the instant litigation.

¶ 5     In 2009, Amcore Bank filed a complaint to foreclose its primary mortgage. In 2010, during the pendency of the lawsuit, the loan was sold to BMO Harris Bank, which took over the foreclosure action. BMO Harris Bank, in turn, sold the loan to the Forest Preserve District of Cook County (Forest Preserve) in June 2013. In August 2013, the trial court granted summary judgment in favor of the Forest Preserve and entered a judgment of foreclosure and sale of the farm. The Forest Preserve was the highest bidder at the foreclosure sale, and the trial court entered a $6.2 million deficiency judgment against defendants.[1]

¶ 6     On May 15, 2014, plaintiff filed a verified complaint against defendants to enforce the note and guaranty executed by them with respect to the Horizon Farms loan. The complaint

---

[1]Defendants appealed this order, resulting in our first decision, in which we found that summary judgment should not have been granted. *BMO Harris Bank*, 2016 IL App (1st) 151338-U. Upon remand, the trial court reinstated its judgment, which we again vacated in *Forest Preserve District*, 2017 IL App (1st) 171564-U. The trial court's judgment after remand is once again pending before this court, in appeal No. 1-18-1323. Additionally, Royalty Farms filed a separate suit against the Forest Preserve, alleging that the Forest Preserve breached the duties it assumed as a landlord when it purchased the farm. In the appeal resulting from that litigation, we vacated the trial court's order granting possession of the property to the Forest Preserve during the pendency of the foreclosure action. *Royalty Farms*, 2017 IL App (1st) 161409. However, these events occurred after the filing of the instant lawsuit and are therefore not relevant to the issues on appeal.

alleged that, on December 21, 2006, Royalty Properties executed a promissory note in favor of Horizon Farms in the amount of $1.5 million, which was secured by a second mortgage. The note was personally guaranteed by the Cannons, pursuant to a guaranty agreement dated December 21, 2006.

¶ 7     The complaint set forth two counts. The first count was for breach of the promissory note and was against Royalty Properties. Count I alleged that the note was in default as a result of nonpayment and that, as of May 14, 2014, $3,509,025.22 was due and owing under the note. Count I further alleged that under the terms of the note, interest continued to accrue at an annual rate of 20% and that Royalty Properties has refused to pay the amounts due and owing under the note.

¶ 8     Count II was for breach of guaranty against the Cannons. Count II alleged that the Cannons guaranteed all sums due and owing under the note and that if the note was in default, the holder of the note was permitted to demand payment of the note from the guarantors. Count II further alleged that plaintiff did demand payment but the Cannons refused to pay the amounts due and owing under the note.

¶ 9     Attached to the complaint were copies of the promissory note; the mortgage; the guaranty; and the affidavit of James McGinley, a trustee and beneficiary of the trust, which made the demand for payment prior to the trust's assignment to plaintiff.

¶ 10     After a denial of a motion to dismiss, the parties engaged in discovery, and plaintiff filed a motion for summary judgment on December 17, 2015, which it amended on June 10, 2016. The motion for summary judgment was granted on August 31, 2016, and on September 13, 2016, plaintiff filed a prove-up affidavit. On November 18, 2016, the trial court issued an opinion in which it found that there was a question of fact concerning the amount of

4

damages. On November 29, 2016, plaintiff filed a motion to reconsider and, on February 2, 2017, the court granted plaintiff's motion for reconsideration, finding that there was actually no question of fact concerning the amount of damages, and entered judgment in favor of plaintiff against defendants in the amount of $8,320,669.43. We affirmed the trial court's grant of summary judgment in *McGinley Partners*, 2018 IL App (1st) 171317, ¶ 68.

¶ 11 On November 9, 2017, while the appeal from the grant of summary judgment was pending, defendants filed a petition to vacate the February 2, 2017, judgment pursuant to section 2-1401 of the Code. Defendants claimed that a December 21, 2006, "Intercreditor Agreement" was an enforceable contract between the parties that barred plaintiff's action against defendants and that this agreement was not disclosed in any way by plaintiff in the instant action. Defendants acknowledged that the agreement was signed by defendant Richard Cannon, but claimed that he was given the document as part of a 500-page group of loan documents which he was not given the chance to review prior to the closing.[2] Defendants claimed that the agreement "did not specifically come to his attention until October 2017, when he reviewed the closing documents during the discovery process of the mortgage foreclosure action" filed by the senior lender (the Forest Preserve).

¶ 12 Defendants claimed that the terms of the intercreditor agreement provided that plaintiff was precluded from enforcing the promissory note against defendants until the senior loan was fully paid. Defendants also claimed that plaintiff would have been required to send a notice to the senior lender prior to initiating an action and that there was no evidence that this notice was sent. Finally, defendants claimed that even if plaintiff was entitled to file its

---

[2]The circumstances surrounding the closing of the sale of the property, including the allegations that defendants were given less than one day to review 500 pages of loan documents prior to closing and were pressured to close or forfeit their nearly $2 million deposit, were the basis of our first decision in *BMO Harris Bank*, 2016 IL App (1st) 151338-U, in which we found that there was a question of fact as to whether economic duress invalidated the loan documents defendants signed.

lawsuit, plaintiff was limited to recovering the principal amount of $1.5 million and a maximum of $200,000 in interest and attorney fees, not the $8 million that was sought by plaintiff. Defendants claimed that plaintiff was fully aware of the existence of the intercreditor agreement prior to filing the instant lawsuit and deliberately deceived the trial court by not disclosing its existence.

¶ 13     As relevant to the instant appeal, attached to the section 2-1401 petition was the affidavit of defendant Richard Cannon, who averred that he first received a copy of the intercreditor agreement at the December 21, 2006, closing on the property, where he was pressured to sign the loan documents, despite the lack of the ability to properly review them, or forfeit defendants' nearly $2 million deposit. Cannon averred that, after the appeal concerning the senior loan had been decided and the case had been remanded to the trial court, the senior lender issued discovery subpoenas to third parties, including a law firm that had been present at the closing. On October 24, 2017, the law firm produced copies of the closing documents, including the intercreditor agreement. Cannon averred:

> "Before the October 24, 2017 [law firm] production in the foreclosure case, I was generally aware that a document entitled 'Intercreditor Agreement' existed, but I had forgotten about it since I last saw it (in a hurried way) amongst over 500 pages of documents presented to me for signing at the December 21, 2006 closing, almost eleven years ago. Before my recent review of it on October 24, 2017, I was not consciously aware that there were provisions in the 'Intercreditor Agreement' which restricted, and limited, the ability of Horizon Farms [(the initial junior lender)], and its assignees, to enforce its separate Note."

¶ 14        Also attached to the section 2-1401 petition was the intercreditor agreement, which provided that it was between Horizon Farms (the "Junior Lender"), Amcore Bank (the "Senior Lender"), and defendant Royalty Properties (the "Borrower"). The recitals of the agreement provided:

>   "A. Senior Lender is making a $14,500,000 'Senior Loan' to Borrower evidenced by a Promissory Note dated December 21, 2006 ('Senior Note') and is secured by a Mortgage dated December 21, 2006 (the 'Senior Mortgage') on the property described on the attached Exhibit A ('Mortgaged Property').
>
>   B. Junior Lender is making a $1,500,000 'Junior Loan' to Borrower which will be evidenced by Promissory Note dated December 21, 2006 ('Junior Note') and is secured by a Mortgage dated December 21, 2006 (the 'Junior Mortgage') on the Mortgaged Property.
>
>   C. As a condition to the extension of the Senior Loan and the Junior Loan, Senior Lender and Junior Lender have required the execution of this Agreement to set forth certain rights and obligations of Senior Lender and Junior Lender with respect to the Senior Loan and the Junior Loan."

¶ 15        Section 2.1 of the agreement provided:

>   "Junior Lender hereby agrees that unless and until the Senior Loan shall have been indefeasibly paid as herein provided, except as otherwise provided under Section 2.2 below or elsewhere in this Agreement: (a) the Junior Loan is and shall be subordinate, to the extent and in the manner hereinafter set forth, to the prior indefeasible payment in full of the Senior Loan, (b) no payment shall be made by or on behalf of Borrower for or on account of the Junior Loan, (c) Junior Lender shall not take or receive from

Borrower, directly or indirectly, in cash or other property or by setoff or in any other manner, including without limitation, from or by way of collateral, payment of all or any of the Junior Loan and (d) Junior Lender shall not initiate any formal actions, unless and until it has given Senior Lender ninety (90) days prior written notice. Senior Lender and Junior Lender acknowledge that Senior Lender shall be entitled to receive the first $14,500,000 of proceeds from any Enforcement Action plus interest and its reasonable costs of any Enforcement Action Foreclosure, not to exceed $1,000,000 in the aggregate and that Junior Lender shall after such payment to Senior Lender then be entitled to receive from any Enforcement Action the amount due on the Junior Note up to a maximum of $1,500,000, plus interest and its reasonable costs of any Enforcement Action, not to exceed $200,000 in the aggregate."

"Enforcement Action" was defined in the agreement as meaning,

"with respect to any Person, the commencement of the exercise of any remedies against such Person including, without limitation, the commencement of any litigation, action, suit, claim, remedy or proceeding, including the commencement of any Insolvency Proceeding or foreclosure proceeding, the exercise of any power of sale, right of setoff, sale by advertisement, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver, the exercise of any other remedies available under the Uniform Commercial Code of any state, or the taking of any other enforcement action against, or the taking of possession or control of, any collateral by the secured party of such Person."

¶ 16    Section 4.1 of the agreement set forth representations, warranties, covenants, and agreements that Horizon Farms, as the junior lender, owed to Amcore Bank, as the senior

lender. Similarly, section 4.2 of the agreement set forth representations, warranties, covenants, and agreements that Amcore Bank owed to Horizon Farms. The agreement does not set forth any representations, warranties, covenants, or agreements between either of the lenders and Royalty Properties as the borrower. Additionally, section 5.7 of the agreement provided:

> "*No Third Party Beneficiaries*. Nothing contained in this Agreement shall be deemed to indicate that this Agreement has been entered into for the benefit of any Person other than Senior Lender and Junior Lender."

The intercreditor agreement was signed by both defendants Richard and Meryl Cannon on behalf of defendant Royalty Properties.

¶ 17    On November 15, 2017, plaintiff filed a combined motion to dismiss the section 2-1401 petition pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2016)). Plaintiff argued that defendants had not alleged a defense that would have precluded the entry of judgment against them. Furthermore, plaintiff claimed that "the allegations and attached discovery documents confirm that [defendants'] failure to raise the claimed defense in the original action is solely the result of [defendants'] own negligence." Specifically, plaintiff claimed that "during discovery, [defendants] themselves produced the Agreement upon which their claimed defense is based, yet failed to raise the Agreement as a defense prior to the entry of judgment." (Emphasis omitted.) Plaintiff also argued that it had not engaged in any deception and had attached and produced all documents required by it during the course of the litigation.

¶ 18    With respect to the issue of whether defendants had raised a meritorious defense, plaintiff claimed that none of the defendants had standing to enforce the intercreditor agreement.

Plaintiff noted that the Cannons were not parties or intended beneficiaries of the agreement. Plaintiff also argued that section 2.1 of the agreement did not preclude the judgment and that, even if it did, defendant Royalty Properties lacked standing to enforce it because it was not made for its benefit. Plaintiff also noted that no proceeds from the judgment had yet been sought or collected, making arguments about the priority of payment premature.

¶ 19    Plaintiff also claimed in its motion to dismiss the section 2-1401 petition that defendants had notice of the agreement since 2006 and were therefore not diligent in bringing the matter to the trial court's attention in November 2017. Defendants had produced the agreement in their discovery responses and claimed that they failed to read it prior to judgment. Plaintiff asserted that this was "concrete proof" that defendants' failure to raise the Agreement as a defense in the original action is solely the result of their own negligence. Plaintiff noted that 16 months passed between defendants' production of the agreement in October 2015 and the final judgment being entered in February 2017. Plaintiff also noted that the agreement was additionally produced in December 2015 by the law firm representing Horizon Farms in the sale, in response to a subpoena issued by defendants.[3]

¶ 20    Attached to the motion to dismiss was a copy of defendants' response to plaintiff's requests to produce, dated October 2, 2015, which referenced "documents produced in this matter [B]ates stamped 1 through 269," as well as a copy of the intercreditor agreement, which bore Bates stamps of 257 through 269. Also attached to the motion to dismiss was a December 15, 2015, subpoena for documents issued by defendants to the law firm that

---

[3]We note that this law firm is a different law firm than that identified by Richard Cannon in his affidavit, in which he averred that he first became aware of the agreement after the other firm's production of the closing documents on October 24, 2017.

represented Horizon Farms at the closing, as well as a copy of the intercreditor agreement included as part of the document production from the law firm.[4]

¶ 21     On November 22, 2017, the parties appeared before the trial court for a hearing on the section 2-1401 petition, as well as plaintiff's motion to dismiss the petition.[5] At the hearing, defendants' counsel did not dispute that the agreement was produced in defendants' discovery responses and admitted that counsel "didn't fly spec it," but argued that he was not required to do so "[b]ecause the issues were defined. And *** my due diligence is confined to the issues as framed." After hearing argument from the parties, the trial court found:

> "I don't believe there are questions of fact in this matter. I believe that the record is clear. The underlying case, when litigated, was litigated. Both sides fought very hard. There were motions to dismiss, motions to reconsider, motions for judgment on the pleadings, discovery. Extensive litigation took place as part of the underlying case.
>
> *** [T]here's just no question of fact that the defendants had the intercreditor agreement. They produced it. Attached to their production was certification by the defendants themselves that it was complete and true. Then [the law firm], who represented Horizon—I think they were the seller, but it was in the real estate deal— they produced it. *** [T]here's just no question of fact that it was in the defendants' possession for a significant period of time prior to the judgment being entered.

---

[4]The intercreditor agreement bears a stamp with the law firm's initials and page numbers 124 through 136 on the bottom of each page.

[5]The transcript of the hearing was attached as an exhibit to plaintiff's response to a motion to quash citations to discover assets that was filed by defendants.

Therefore, the Court has no alternative other than to find there wasn't due diligence in the underlying case. That's the standard I'm dealing with, is the 2-1401 standard. So I'm going to grant the motion to dismiss."

¶ 22   The trial court later expanded on the basis for its decision:[6]

"I'm not granting the motion to dismiss based on due diligence in bringing the motion. It was due diligence in the underlying action.

But most importantly, I believed there was no meritorious defense. I believed that the intercreditor agreement does not preempt the judgment. And therefore, there would be no meritorious defense.

I think the [defendants] lack standing to enforce the lien. I think the intercreditor agreement is unambiguous. *** [T]hey don't have standing. And the lien payment priority terms of it have not come into play. So *** whether it was timely argued in the underlying case or not, I don't think it provides a meritorious defense to the [defendants]."

The trial court entered an order dismissing defendants' section 2-1401 petition with prejudice "for the reasons stated on the record." The same order denied defendants' request for an evidentiary hearing "as there is no question of fact."

¶ 23   Defendants filed a notice of appeal, and this appeal follows.

¶ 24                                    ANALYSIS

¶ 25   On appeal, defendants claim that the trial court erred in finding that they had not alleged a meritorious defense or shown due diligence in raising the defense in the underlying

_____

[6]The report of proceedings shows that the parties were called back into court by the trial court, which stated that it "thought a reviewing court and yourselves are entitled to a full ruling."

proceedings. Section 2-1401 "provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated 'after 30 days from the entry thereof.' " *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220 (1986) (quoting Ill. Rev. Stat. 1983, ch. 110, ¶ 2-1401(a)). "[A] section 2-1401 petition can present either a factual or legal challenge to a final judgment or order. *** [T]he nature of the challenge presented in a section 2-1401 petition is critical because it dictates the proper standard of review on appeal." *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. Our supreme court has noted that the *de novo* review of a section 2-1401 petition is limited to the "specific niche" of section 2-1401 petitions, "presenting a purely legal claim challenging a final judgment or order as void." *Warren County*, 2015 IL 117783, ¶ 49. Additionally, in such a case, the petitioner is not required to establish a meritorious defense or satisfy due diligence requirements. *Warren County*, 2015 IL 117783, ¶ 48. " '[T]he allegation [in a section 2-1401 petition] that the judgment or order is void substitutes for and negates the need to allege a meritorious defense and due diligence.' " *Warren County*, 2015 IL 117783, ¶ 48 (quoting *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 104 (2002)).

¶ 26        In the case at bar, defendants claim that they have presented such a "purely legal claim" such that *de novo* review is appropriate and they are excused from complying with the other requirements of section 2-1401 petitions. We first note that they raise this argument for the first time in their reply brief, after "further examination" of our supreme court's analysis in *Warren County*. It is well settled that a party may not raise an issue for the first time in its reply brief. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Moreover, the instant case is not the type of case contemplated by the *Warren County* court,

which expressly noted that *de novo* review is limited to petitions "presenting a purely legal claim challenging a final judgment or order as void." *Warren County*, 2015 IL 117783, ¶ 49. Instead, defendants raise a factual challenge to the judgment, namely, that under the factual circumstances of the case, plaintiff was not entitled to relief. Where the petition raises a factual challenge, "[t]o be entitled to relief under section 2-1401, the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief." *Airoom*, 114 Ill. 2d at 220-21. "The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence." *Airoom*, 114 Ill. 2d at 221.

¶ 27 "Whether a section 2-1401 petition should be granted lies within the sound discretion of the circuit court, depending upon the facts and equities presented." *Airoom*, 114 Ill. 2d at 221. "In reviewing discretionary rulings by the trial court, an appeals court must look to the criteria on which the trial court should rely to determine if the trial court abused its discretion." (Internal quotation marks omitted.) *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006). " '[A] trial court abuses its discretion if it fails to apply the proper criteria when it weighs the facts,' and a reviewing court 'must consider both the legal adequacy of [the] way the trial court reached its result as well as whether the result is within the bounds of reason.' " *Paul*, 223 Ill. 2d at 99 (quoting *People v. Ortega*, 209 Ill. 2d 354, 360 (2004)).

¶ 28 In the case at bar, the trial court found that defendants had failed to demonstrate the existence of a meritorious defense and also had failed to show due diligence in presenting

14

that defense to the trial court. Since we agree with the trial court that defendants failed to establish due diligence in raising their defense, we need only consider that element and need not discuss whether defendants had a meritorious defense or were diligent in presenting their petition to the court.

¶ 29    As noted, to prevail on a section 2-1401 petition, the petitioner must affirmatively set forth specific factual allegations supporting both the petitioner's "due diligence in presenting [a meritorious] defense or claim to the circuit court in the original action; and *** due diligence in filing the section 2-1401 petition for relief." *Airoom*, 114 Ill. 2d at 220-21. "No bright-line rule exists for judging whether a petitioner has acted diligently. Rather, due diligence is judged by the reasonableness of the petitioner's conduct under all of the circumstances." *Paul*, 223 Ill. 2d at 99-100.

¶ 30    In the case at bar, we cannot find that the trial court abused its discretion in finding that defendants had failed to establish due diligence in raising their defense. On appeal, defendants focus heavily on plaintiff's alleged failure to attach the intercreditor agreement to its pleadings or to produce the agreement in discovery. However, they gloss over the fact that defendants had this document in their possession since the closing. First, defendant Richard Cannon admitted to signing the document at the closing in December 2006. Furthermore, even leaving aside this fact (given the arguments concerning the circumstances under which the agreement was signed), defendants produced the agreement in their October 2, 2015, document production, meaning that they certainly could be charged with knowledge of the document by that point at the latest. Additionally, the law firm that represented Horizon Farms at the closing *also* turned over the intercreditor agreement in response to a December 15, 2015, subpoena by defendants. Thus, all of the evidence in the record shows that

defendants had the agreement in their possession *and should have known of its existence* (even if Cannon had "forgotten" that he had originally signed it in 2006) by the end of 2015 at the latest. Since summary judgment was not granted until August 31, 2016, eight months after the document was produced by the law firm, we cannot find that the trial court abused its discretion in finding that the due diligence requirement had not been satisfied.

¶ 31    Defendants' only response to the arguments concerning their diligence is to argue that the due diligence requirement should be relaxed in the instant case. Our supreme court has noted that "[o]ne of the guiding principles *** in the administration of section 2-1401 relief is that the petition invokes the equitable powers of the circuit court, which should prevent enforcement of a default judgment when it would be unfair, unjust, or unconscionable." *Airoom*, 114 Ill. 2d at 225. "Because a section 2-1401 petition is addressed to equitable powers, courts have not considered themselves strictly bound by precedent, and where justice and good conscience may require it[,] a default judgment may be vacated even though the requirement of due diligence has not been satisfied."[7] *Airoom*, 114 Ill. 2d at 225.

¶ 32    "Relaxation of the due diligence requirement thereby entitling a defendant to a motion to vacate a judgment is justified only under extraordinary circumstances." *Ameritech Publishing of Illinois, Inc. v. Hadyeh*, 362 Ill. App. 3d 56, 60 (2005) (citing *All-Steel Employees Credit Union v. Singh*, 345 Ill. App. 3d 1005, 1008 (2004)); *Gonzalez v. Profile Sanding Equipment, Inc.*, 333 Ill. App. 3d 680, 686 (2002). "Although it is true that some decisions have relaxed or even excused the due diligence requirements, courts have only done so in the extraordinary circumstances where it is necessary to prevent an *unjust* entry of default judgment [citation], or where there is unconscionable conduct by the opposing party that

---

[7] We note that the instant case does not involve a default judgment but has been heavily litigated by the parties throughout the proceedings.

would require that the due diligence requirement be relaxed [citation]." (Emphasis in original.) *Gonzalez*, 333 Ill. App. 3d at 689. "[I]n each case there was evidence of fraudulent conduct by the plaintiff in procuring or concealing the judgment, or other unusual circumstances which made enforcement of the judgment unjust." *European Tanspa, Inc. v. Shrader*, 242 Ill. App. 3d 103, 108 (1993). Our supreme court has cautioned that, "[w]hile a liberal construction must be given to the petition to prevent an unjust result [citation], 'the ambit of section [2-1401] relief must not be overbroadened to such an extent that principles of equity and an ordered concept of justice are diluted' [citation]." *Airoom*, 114 Ill. 2d at 227 (quoting *Lammert v. Lammert Industries, Inc.*, 46 Ill. App. 3d 667, 676-77 (1977)).

¶ 33    In the case at bar, we cannot find that the facts alleged justify the relaxation of the due diligence requirement. Defendants make a number of serious allegations against plaintiff, including accusing plaintiff of fraud, perjury, filing false affidavits, and deliberately concealing the existence of the intercreditor agreement from the trial court. However, none of these arguments are persuasive. For instance, defendants claim that the intercreditor agreement was a "loan document" that should have been attached to the complaint. However, "loan documents" as defined by the note consist of "This Note, the Mortgage and any and all other documents now or hereafter executed by Maker and/or others in favor of Holder, which wholly or partially secure  or guarantee payment of this Note or pertain to indebtedness evidenced by this Note, and any modification, renewal or extension thereof." An agreement between the lenders governing the priority of the loans would not be encompassed by this definition. Similarly, defendants claim that plaintiff failed to produce the agreement in response to discovery requests that sought documents evidencing "assets" of Horizon Farms and any "interest" in the note. Again, an agreement discussing loan priority would not fall

within these requests. Finally, defendants claim that plaintiff submitted false affidavits because the calculation of interest included in the affidavits did not take into account a cap that defendants claim was imposed by the intercreditor agreement. However, the mere fact that defendants have a different interpretation of the meaning of the document than plaintiff does not mean that an affidavit filed in support of plaintiff's interpretation is "false."

¶ 34    "Due diligence requires the section 2-1401 petitioner to have a reasonable excuse for failing to act within the appropriate time." *Airoom*, 114 Ill. 2d at 222. "Specifically, the petitioner must show that his failure to defend against the lawsuit was the result of an excusable mistake and that under the circumstances he acted reasonably, and not negligently, when he failed to initially resist the judgment." *Airoom*, 114 Ill. 2d at 222. " 'Relief under section [2-1401] is  available only to those who diligently pursue their legal defenses and remedies in court, not to those who disregard these procedures on the gamble that better results can be obtained through other procedures or at a cheaper cost.' " *Airoom*, 114 Ill. 2d at 224 (quoting *Abbell v. Munfield*, 76 Ill. App. 3d 384, 388 (1979)). As our supreme court found in *Airoom*, in the case at bar, "[w]hen all of the circumstances of this case are viewed in their entirety, there is no doubt that [defendants'] dilemma is the result of [their] own negligence and indifference to or disregard of the circuit court's process." *Airoom*, 114 Ill. 2d at 224-25. Accordingly, we cannot find that the trial court erred in finding that the due diligence requirement had not been satisfied.

¶ 35    Since defendants have failed to establish one of the requirements for vacating the judgment, we have no need to consider whether they also failed to establish that they had a meritorious defense to the underlying action or whether they established due diligence in presenting their petition to the trial court.

¶ 36                                          CONCLUSION

¶ 37      The trial court did not abuse its discretion in finding that defendants had failed to demonstrate due diligence in presenting their defense in the underlying lawsuit, where defendants had actual knowledge of the intercreditor agreement no later than eight months prior to the entry of summary judgment.

¶ 38      Affirmed.