# Illinois Official Reports

## Appellate Court

*McGinley Partners, LLC v. Royal Properties, LLC*, 2020 IL App (1st) 190546

| | |
|---|---|
| Appellate Court Caption | McGINLEY PARTNERS, LLC, an Illinois Limited Liability Company, Plaintiff-Appellee, v. ROYALTY PROPERTIES, LLC, a Florida Limited Liability Company; RICHARD KIRK CANNON, an Individual; and MERYL SQUIRES CANNON, an Individual, Defendants-Appellants. |
| District & No. | First District, Fourth Division<br>Nos. 1-19-0546, 1-19-0785 cons. |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-005231; the Hon. Daniel Kubasiak, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard K. Cannon, of Barrington, for appellants.<br><br>Katherine M. Saldanha Olson and Joseph S. Messer, of Messer Strickler, Ltd., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    The instant consolidated appeals represent the second attempt of defendants Royalty Properties, LLC (Royalty Properties), Richard Kirk Cannon, and Meryl Squires Cannon to vacate a judgment against them and in favor of plaintiff McGinley Partners, LLC, under section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2018)). Plaintiff filed a lawsuit against defendants to enforce a note and guaranty executed in connection with the sale of a horse farm and obtained an $8.3 million judgment against defendants in February 2017. Nine months after the entry of the judgment, defendants filed their first section 2-1401 petition, which was denied by the trial court. Defendants then filed a second section 2-1401 petition in February 2019, based on alleged fraud and forgery in the execution of one of the closing documents. While that petition was pending, defendants also filed a motion for a temporary stay to perfect a settlement, claiming that the parties had reached a settlement. The trial court denied both the section 2-1401 petition and the motion for a stay. Defendants appeal both orders and, for the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3    As noted, the instant appeal is not the first time the parties have been before this court regarding the loan and guaranties at issue.[1] Accordingly, where appropriate, we draw from our prior decisions for our facts.

¶ 4    Defendants Richard Cannon and Meryl Squires Cannon (collectively, the Cannons) owned 43 horses, which resided on a farm in Barrington Hills owned by Horizon Farms, Inc. (Horizon Farms). In 2006, Horizon Farms solicited bids in an effort to sell the farm, and the Cannons submitted a bid of $19.35 million for the property, which was accepted. The Cannons made an earnest money deposit of nearly $2 million. They financed the rest of the purchase price, primarily by obtaining a loan of $14.5 million from Amcore Bank in exchange for a mortgage

---

[1]There have been four separate lawsuits before this court concerning the underlying real estate transaction. They have resulted in seven decisions by this court, with the instant opinion becoming the eighth. First, defendants Richard Cannon and Meryl Squires Cannon were plaintiffs in a taxpayer action against the Forest Preserve District of Cook County (Forest Preserve) concerning its authority to acquire title to the property. *Baker v. Forest Preserve District*, 2015 IL App (1st) 141157. Next, defendants litigated the foreclosure of the primary mortgage on the property, leading to appeals in (1) *BMO Harris Bank, N.A. v. Royalty Properties, LLC*, 2016 IL App (1st) 151338-U, (2) *Forest Preserve District v. Royalty Properties, LLC*, 2017 IL App (1st) 171564-U, and (3) *Forest Preserve District v. Royalty Properties, LLC*, 2018 IL App (1st) 181323. While the foreclosure action was pending, defendant Royalty Farms, LLC, filed a separate action against the Forest Preserve, alleging that the Forest Preserve breached the duties it assumed as a landlord when it purchased the farm. *Royalty Farms, LLC v. Forest Preserve District*, 2017 IL App (1st) 161409. Finally, defendants have litigated the attempts to collect on the junior note on the property, leading to appeals in (1) *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317, *appeal denied*, No. 124085 (Ill. Nov. 28, 2018); (2) *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 172976; and (3) the instant appeal. There have also been at least three federal lawsuits, the most recent of which was considered by the Seventh Circuit in July 2018. See *Cannon v. Forest Preserve District*, No. 13 C 6589, 2014 WL 1758475 (N.D. Ill. May 2, 2014); *Squires-Cannon v. White*, 864 F.3d 515 (7th Cir. 2017); and *Squires-Cannon v. Forest Preserve District*, 897 F.3d 797 (7th Cir. 2018).

on the property and the personal guaranties of the Cannons. In order to obtain this financing, Amcore Bank required the Cannons to form a limited liability corporation to sign for the loan as the mortgagee. Accordingly, the Cannons created defendant Royalty Properties. In addition, Horizon Farms, the seller, loaned $1.5 million to Royalty Properties, evidenced by a promissory note and secured by a second mortgage on the property, as well as the personal guaranties of the Cannons. Horizon Farms subsequently assigned its interest in the note and guaranty to the William J. McGinley Marital Trust (trust) upon the dissolution and liquidation of Horizon Farms. On November 10, 2009, the trust assigned all of its right, title, and interest in the note and guaranty to plaintiff McGinley Partners, LLC. It is this loan that is the subject of the instant litigation.

¶ 5 In 2009, Amcore Bank filed a complaint to foreclose its primary mortgage. In 2010, during the pendency of the lawsuit, the loan was sold to BMO Harris Bank, which took over the foreclosure action. BMO Harris Bank, in turn, sold the loan to the Forest Preserve District of Cook County (Forest Preserve) in June 2013. In August 2013, the trial court granted summary judgment in favor of the Forest Preserve, entered a judgment of foreclosure, and ordered the sale of the farm. The Forest Preserve was the highest bidder at the foreclosure sale, and the trial court entered a $6.2 million deficiency judgment against defendants.[2]

¶ 6 On May 15, 2014, plaintiff filed a verified complaint against defendants to enforce the note and guaranty executed by them with respect to the Horizon Farms loan. The complaint alleged that, on December 21, 2006, Royalty Properties executed a promissory note in favor of Horizon Farms in the amount of $1.5 million, which was secured by a second mortgage. The note was personally guaranteed by the Cannons pursuant to a guaranty agreement dated December 21, 2006.

¶ 7 The complaint set forth two counts. The first count was for breach of the promissory note and was against Royalty Properties. Count I alleged that the note was in default as a result of nonpayment and that, as of May 14, 2014, $3,509,025.22 was due and owing under the note. Count I further alleged that, under the terms of the note, interest continued to accrue at an annual rate of 20% and that Royalty Properties has refused to pay the amounts due and owing under the note.

¶ 8 Count II was for breach of guaranty against the Cannons. It alleged that the Cannons guaranteed all sums due and owing under the note and that if the note was in default, the holder of the note was permitted to demand payment of the note from the guarantors. Count II further alleged that plaintiff had demanded payment but the Cannons refused to pay the amounts due and owing under the note.

¶ 9 Attached to the complaint were copies of the promissory note, the mortgage, the guaranty, and the affidavit of James McGinley, a trustee and beneficiary of the trust that made the demand for payment prior to the trust's assignment to plaintiff.

¶ 10 After a denial of a motion to dismiss, the parties engaged in discovery, and plaintiff filed a motion for summary judgment, which was granted on August 31, 2016. After plaintiff filed its prove-up affidavit, the trial court issued an opinion in which it found that there was a question

---

[2]The trial court's grant of summary judgment was reversed by this court in *BMO Harris Bank*, 2016 IL App (1st) 151338-U. After a trial, an order confirming the foreclosure sale and entering a deficiency judgment was entered on September 30, 2019. Defendants filed a notice of appeal under case No. 1-19-2236, but that appeal was dismissed by agreement on December 17, 2019.

of fact concerning the amount of damages. Plaintiff filed a motion to reconsider, and on February 2, 2017, the court granted plaintiff's motion for reconsideration, finding that there was actually no question of fact concerning the amount of damages. It entered judgment in favor of plaintiff against defendants in the amount of $8,320,669.43. We affirmed the trial court's grant of summary judgment. in *McGinley Partners*, 2018 IL App (1st) 171317, ¶ 68.

¶ 11    On November 9, 2017, while the appeal from the grant of summary judgment was pending, defendants filed a petition to vacate the February 2, 2017, judgment pursuant to section 2-1401 of the Code. Defendants claimed that a December 21, 2006, "Intercreditor Agreement" was an enforceable contract between the parties that barred plaintiff's action against defendants and that this agreement was not disclosed in any way by plaintiff in the instant action. Defendants acknowledged that the agreement was signed by defendant Richard Cannon but claimed that he was given the document as part of a 500-page group of loan documents and was not given the chance to review them prior to the closing.[3] Defendants claimed that the agreement did not come to their attention until they reviewed the closing documents during the foreclosure action filed by the senior lender (currently the Forest Preserve).

¶ 12    On November 15, 2017, plaintiff filed a motion to dismiss the section 2-1401 petition, claiming that (1) defendants had not alleged a defense that would have precluded the entry of judgment against them, (2) plaintiff had not engaged in any deception and had attached and produced all documents required by it during the course of the litigation, (3) none of the defendants had standing to enforce the intercreditor agreement, and (4) defendants were not diligent in bringing the matter to the trial court's attention because the document had been in their possession since 2006.

¶ 13    On November 22, 2017, the parties appeared before the trial court for a hearing on the section 2-1401 petition, as well as on plaintiff's motion to dismiss the petition. Prior to the commencement of the hearing, the trial court asked the parties whether

> "procedurally, are we all in agreement that we want this hearing today and now? This was presented this morning. I'm comfortable. I've had enough of an opportunity to review it. But I want to make sure that we're all in agreement that we should be proceeding today and you don't want to file something."

Defendants' counsel indicated that he was prepared to proceed with the hearing at that time. However, counsel noted that "I learned something last night—or literally late in the afternoon yesterday that I think is important both factually and legal for these proceedings today, which I will raise with the Court, that I think might indicate or shed some different light on this."

¶ 14    Plaintiff's counsel proceeded to argue that the section 2-1401 petition should be dismissed because defendants had failed to establish a meritorious defense or that they had been diligent in bringing the matter to the court's attention. During his argument, defense counsel asserted that the terms of the intercreditor agreement barred plaintiff's suit and maintained that defendants had not closely examined the closing documents until discovery in the foreclosure suit, at which point they discovered the intercreditor agreement. Defense counsel argued that

---

[3]The circumstances surrounding the closing of the sale of the property, including the allegations that defendants were given less than one day to review 500 pages of loan documents prior to closing and were pressured to close or forfeit their nearly $2 million deposit, were the basis of our first decision in *BMO Harris Bank*, 2016 IL App (1st) 151338-U, in which we found that there was a question of fact as to whether economic duress invalidated the loan documents defendants signed.

he was not required to "fly spec" each closing document, as the issues were framed by the pleadings, and claimed that plaintiff had been deceptive in not disclosing the existence of the intercreditor agreement. Defense counsel then claimed that "we learned last night" that there were e-mails showing that there had been a prior version of the intercreditor agreement. Defense counsel argued that

> "what we have here, what we have is an indication that this agreement was in one form, in one version on the day of the closing signed by my client, even though he didn't read it, and then we have the next morning changes that were never disclosed to my client."[4]

Defense counsel then continued arguing that the terms of the intercreditor agreement precluded plaintiff's action. Defense counsel continued:

> "There has been no violation of due diligence. There's been no negligence here because as a lawyer my duty is confined by the issues, and my client did not say in this affidavit, I forgot. He didn't say that. He said, I never knew. I never knew.

> And now they raise it as a defense when if you look at this document, at the bottom of the first page, you're going to see a Chicago Title version number. At the bottom it says—it's a long number, and it says at the end point 3. And you go through these pages, it's all point 3, point 3, point 3, point 3, point 3 until you get to the signature page, and the signature page is point 1. And then you go to the—the legal description is point 3.

> Now, what does that mean? It means that in the [Chicago Title] computer system this ends up being—the binding document ends up being the third version that is prepared, changed, kicked out, and they take signature pages from the one that my client signed during a hurried closing, attach it, and then end up surfacing this. We don't know what was before. We don't know what version was before. It could be even more favorable. And yet, this is the document they've known about, and it's a fraudulent document in my opinion. They're bound by it because they signed it. They attached the signature pages. I don't know what was—went before this. I don't know what was really signed at the closing and neither does my client."

Defense counsel continued, arguing that defendants should not have been expected to discover the intercreditor agreement and that plaintiff committed fraud by failing to disclose it, concluding:

> "Now, what happened is that the discovery in the other case, because it's on remand, now [the] senior lender's role and petition is in focus, and that's why these documents were fly specced, and that's why we've come up with these.

> So we may not even have the correct agreement that was signed at closing. I still think it's binding, but the prior agreement might even be more favorable to my clients."

---

[4]Defendants confirmed in their reply in support of a motion to quash subpoenas that "the Cannons recently learned for the first time on November 21, 2017 *** that there had been an email exchange between the lawyers for Amcore Bank and Horizon Farms one day after the 2006 closing. Those emails conclusively demonstrate that the Intercreditor Agreement was *altered* with respect to the terms that originally existed in it on the day of the closing, December 21, 2006, when it was executed by Royalty Properties—and that the Royalty Properties previous-day signature page was then attached to the altered document without its knowledge." (Emphasis in original.)

¶ 15    In responding to defense counsel's arguments, plaintiff's counsel again argued that the intercreditor agreement did not bar plaintiff's action and that defendants were not diligent in presenting their claim. Counsel noted:

> "[W]ith respect to these additional documents, counsel stated that this agreement is binding, so I don't know what he's bringing these additional documents for. They're also not attached to the petition. They're extraneous to the agreement themselves. I think the point he stressed is that the client knew about them, Robert [*sic*] read those documents. Even if you didn't read the 500 documents, I would stress that he probably should have read the 269 pages that were produced which included the intercreditor agreement."

Counsel continued:

> "[W]hile counsel wants to qualify that as a question of fact as whether or not they should have read those documents, I don't think we need to waste this Court's time or anybody's time with sitting through a hearing to decide whether or not an attorney or his clients are diligent in bringing an agreement that they not only signed themselves, whatever version of it you're going to claim it was in, you attach the version that you are relying on in the petition. So that one says 2006. The same document was also produced by them in discovery and by [the firm representing Horizon Farms at the closing]. That's all we really need to talk about here is that aspect of a petition."

¶ 16    After hearing argument from the parties, the trial court first found that there was no due diligence in raising the matter in the underlying action, as defendants undisputedly had the intercreditor agreement in their possession. Additionally, the court found that defendants lacked a meritorious defense to the underlying action. Accordingly, the trial court entered an order dismissing defendants' section 2-1401 petition with prejudice, a decision we affirmed on appeal in *McGinley Partners*, 2018 IL App (1st) 172976, ¶¶ 1, 22. In our decision, we found that defendants had failed to establish that they acted with due diligence and, consequently, found it unnecessary to consider whether they had established a meritorious defense. *McGinley Partners*, 2018 IL App (1st) 172976, ¶ 35.

¶ 17    On February 1, 2019, defendants filed a second verified petition to vacate judgment, seeking to vacate the judgment pursuant to section 2-1401 of the Code. Defendants claimed that they discovered—in documents received November 21, 2017, and in depositions conducted in March 2018—that on the day after the closing, Horizon Farms and Amcore Bank "secretly and substantially altered" the intercreditor agreement and "forged" defendants' signatures on the document by attaching the prior day's signature page to the new version. Defendants claimed that Horizon Farms and Amcore Bank then destroyed all copies of the original document and caused the altered document to be distributed to defendants as though it was a true copy of what had been signed.

¶ 18    Defendants claimed that the new version of the intercreditor agreement deleted a paragraph, former paragraph 5.9, as well as inserting new language that was favorable to the lenders and increased the risk to the Cannons. Defendants pointed to a provision limiting the amount of post-default interest and fees, noting that the amount that Amcore Bank could collect on the senior loan prior to Horizon Farms's recovery on the junior loan had been raised from $500,000 to $1 million, which they claimed increased their risk under the Horizon Farms loan. Defendants also pointed to the addition of a paragraph expressly stating that the

intercreditor agreement was solely for the benefit of the lenders, claiming that the insertion of this language prevented defendants from enforcing the agreement.

¶ 19    Attached to the section 2-1401 petition were a number of exhibits. First, an e-mail dated December 22, 2006, from Dennis Wilson, Horizon Farms's counsel, to Robert McGinley and Scott Gudmundson, Amcore Bank's attorney, provided, in relevant part:

"Scott: Enclosed is a blackline of the Intercreditor reflecting the changes that we discussed last night. Please call me about this as soon as possible."

There is no attachment included in the record on appeal. Another e-mail, sent slightly over an hour later on behalf of Gudmundson, contained as an attachment a version of the intercreditor agreement containing a footer that ended in ".2" (version 2). The attachment begins with a page marked "13/22," and contains a version of the agreement including several handwritten changes. One such change was to paragraph 2.1, which originally provided, in relevant part:

"Senior Lender and Junior Lender acknowledge that Senior Lender shall be entitled to receive the first $14,500,000 of proceeds from any Enforcement Action plus interest and its reasonable costs of any Enforcement Action, not to exceed $500,000 in the aggregate and that Junior Lender shall after such payment to Senior Lender then be entitled to receive from any Enforcement Action the amount due on the Junior Note up to a maximum of $1,500,000, plus interest and its reasonable costs of any Enforcement Action, not to exceed $200,000 in the aggregate."

A handwritten change to paragraph 2.1 crossed out "$500,000" and inserted "$1,000,000" for the limitation on recovery by the senior lender.

¶ 20    Paragraph 5.7 was included in version 2 with no handwritten changes,[5] and provided:

"5.7 *No Third Party Beneficiaries.* Nothing contained in this Agreement shall be deemed to indicate that this Agreement has been entered into for the benefit of any Person other than Senior Lender and Junior Lender."

Finally, version 2 follows paragraph 5.8 with paragraph 5.10; there is no paragraph 5.9. Version 2 ends on page 9, with signature lines immediately below the ending of the text.

¶ 21    Next, an e-mail sent approximately an hour later from Wilson to Gudmundson provided:

"Scott: Enclosed is the revised form of the Intercreditor Agreement reflecting the changes discussed with you. I will send the clean copy, including the legal description to Angie Koetters for her to attach the signature pages. Please confirm to her that is acceptable to you."

Seven minutes later, an e-mail sent from Wilson to Koetters provided:

"Angie: Enclosed is the final form of the Intercreditor Agreement. Please attach the signature pages that were deposited with you to this. I have asked Scott Gudmunson [*sic*] to confirm that [with] you."

As with the last e-mail sent from Wilson, there are no attachments included in the record on appeal for either of these e-mails.

¶ 22    Next, attached to the section 2-1401 petition was a copy of the intercreditor agreement that was allegedly provided to defendants (version 3). The majority of the pages of the document contain a footer that ends with ".3," other than the signature page, which ends with ".1." Most

---

[5]While plaintiff repeatedly claims that paragraph 5.7 was not originally included in the intercreditor agreement, the record shows that, at the latest, this paragraph was included in version 2.

of the changes handwritten onto version 2 were included in version 3; version 3 adds a total of 10 lines of text. Version 3 ends with 17 lines of text on page 9, with a separate signature page following; the signature page is also labeled as page 9.

¶ 23 Also attached to the section 2-1401 petition were excerpts of transcripts from the discovery depositions of Wilson and Gudmundson in connection with the foreclosure action, which were conducted on February 28, 2018, and March 21, 2018, respectively. In his deposition, Wilson was unable to recall most of the details of the closing, but testified that his "best recollection" was that the closing took place over two days. One of the items that was not completed the first day was the intercreditor agreement, which was "a rather last minute document" that was prepared to address the relationship between the first lien with Amcore Bank and the second lien with Horizon Farms. Based on e-mails that were presented to him as exhibits, Wilson testified that he had a telephone conversation with Gudmundson on the evening of December 21, 2006, which resulted in changes to the intercreditor agreement. Wilson testified that the final intercreditor agreement was the third version, which was sent to Chicago Title, and that he requested that the original signature page be appended to the third version. Wilson testified that defendants' counsel was not copied on the e-mail correspondence concerning the intercreditor agreement. When asked why he asked that the original signature page be appended to the third version of the intercreditor agreement, Wilson responded, "[b]ecause the parties had agreed to it." He was unable to recall what circumstances led him to believe that Royalty Properties had agreed to the changes.

¶ 24 In his deposition, Gudmundson also testified that the closing occurred over two days and that Wilson took the lead in drafting the intercreditor agreement. Gudmundson testified that the parties had signed the intercreditor agreement on December 21, 2006, and left the signature pages with the closer "because the final form hadn't been agreed to" and they were still working on it. Gudmundson testified that if parties deposited a signature page with the closing agent, they intended that the signatures would be attached to a document later; Gudmundson testified that "that's the whole point." Gudmundson later testified that "[t]here was not a complete final version of the intercreditor agreement signed by the parties on December 21. It was a cutoff signature page following a page that says, 'Signature page follows, deposited in the escrow on the 21st.' Everyone walked out of that closing knowing that this document was going to change." Gudmundson testified that defendants' attorney likely would not have been concerned about the changes to the intercreditor agreement, as they were only concerned with "who got what money between the two creditors." He and Wilson exchanged drafts of the intercreditor agreement via e-mail and fax on December 22. Gudmundson could not recall whether the changes were discussed with defendants' attorney, with whom he had communicated via telephone that day, but testified that defendants' attorney was not included in the e-mails. Gudmundson testified that he did not recall defendants' attorney expressly stating that his clients' signatures could be affixed to a document that would later be finalized.

¶ 25 Finally, attached to the section 2-1401 petition was the affidavit of defendant Richard Cannon, in which he averred that defendants did not authorize anyone to attach their signatures to a later-modified agreement, nor would their attorney have done so. Cannon further averred that the original intercreditor agreement did not contain paragraph 5.7 and that the page numbering of the documents indicated that at least 20 lines of text were added between the original version and version 3. Cannon averred that defendants would not have signed the note

and guaranty if the intercreditor agreement had included the modified provisions included in version 3.

¶ 26    On February 22, 2019, plaintiff filed a motion to dismiss the section 2-1401 petition pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2018)), claiming that the petition was barred by *res judicata* because both the original section 2-1401 petition and the instant section 2-1401 petition were based on the allegation that paragraph 2.1 of the intercreditor agreement constituted a meritorious defense to the judgment. Plaintiff also pointed to the fact that the purported limits on recovery between defendants and the junior lender were not alleged to have changed between versions—the only claimed unauthorized change was an increase to the aggregate amount of costs the senior lender could purportedly recover. Plaintiff also argued that, at a minimum, the petition was barred by collateral estoppel, as all of the claimed fraudulent changes to the intercreditor agreement were apparent on the face of the agreement, which had been in defendants' possession since December 2006. Additionally, the trial court in the first section 2-1401 petition had concluded that paragraph 2.1 did not provide a meritorious defense, collaterally estopping defendants from again raising the argument.

¶ 27    Plaintiff also claimed that the petition was barred by judicial estoppel because defendants had previously claimed that the intercreditor agreement attached to the petition was a true and accurate copy of the governing agreement and their current contentions that they would not have signed the intercreditor agreement with its present terms was belied by their prior admissions that they did not read the agreement prior to signing and were not aware of its provisions. Finally, plaintiff claimed that defendants failed to establish a meritorious defense because paragraph 2.1 did not alter defendants' obligations under the note or guaranty, defendants did not have standing to enforce paragraph 2.1, and defendants had not been diligent in discovering the defense or in presenting the petition.

¶ 28    Attached to the motion to dismiss was, *inter alia*, defendants' motion to dismiss the foreclosure action, filed on March 8, 2018, in which they claimed that the foreclosure action should be dismissed based on the recent discovery of the fact that the intercreditor agreement had been modified after defendants signed it, which they contended constituted forgery and fraud.

¶ 29    On March 12, 2019, defendants filed a combined response to the motion to dismiss and reply in support of their section 2-1401 petition, claiming that they had established a meritorious defense and that they had presented their claims with due diligence.

¶ 30    On March 14, 2019, defendants filed a "Motion for Temporary Stay to Perfect Settlement," in which defendants claimed that the parties had reached a settlement agreement in principle and had agreed to seek an immediate stay of the proceedings while the details were finalized. Accordingly, defendants requested a stay of at least two weeks.

¶ 31    On March 15, 2019, the parties came before the trial court for a hearing on the section 2-1401 petition, as well as on a number of other pending motions concerning citations to discover assets. The court first addressed defendants' motion for a temporary stay, asking whether there had been a settlement. Plaintiff's counsel responded, "No." Defendants' counsel stated that there were "some emails that formulate the settlement" and provided the trial court with copies of the e-mails.[6] Defendants' counsel stated that on March 7, defendant Meryl

---

[6]The e-mails are not contained in the record on appeal.

Squires Cannon reached out to plaintiff and asked if they could settle the case. On March 11, Robert McGinley made a counteroffer on behalf of plaintiffs, to which she, in turn, counteroffered on March 12. Plaintiff made another counteroffer, which Meryl accepted on March 14. Plaintiff's counsel interrupted defendants' counsel, stating "If. I think 'if' was a big part of that."[7] Defense counsel then continued arguing that there was a settlement, and the trial court interjected, noting that it was prepared to enter an order denying defendants' section 2-1401 petition. The court stated:

> "THE COURT: So the issue of the judgment is the judgment is the judgment, as far as I'm concerned.
>
> And the only issue is: How does the creditor collect and how does the Court preserve and protect the rights of the debtor?
>
> [DEFENDANTS' COUNSEL]: Well, we have a settlement. So that means this case is over, Judge. There's no need—
>
> THE COURT: Until you give me a settlement agreement signed by both parties, it is not over."

¶ 32    Defense counsel then continued to claim that there was a settlement, and plaintiff's counsel interrupted:

> "[PLAINTIFF'S COUNSEL]: There is no settlement, [Y]our Honor. And I suspect that counsel failed to provide you the next email in that chain where our client says: Meryl, we have never agreed to stay the litigation. We cannot do so unless and until we sign a fully binding settlement agreement and have adequate security in place to ensure your performance under that agreement.
>
> THE COURT: All right.
>
> [DEFENDANTS' COUNSEL]: Judge, we have a settlement on the number. Okay? The only issue—
>
> THE COURT: But, Counsel, I appreciate that, but you also understand that a lot goes into reaching a final settlement.
>
> And you also I suspect can appreciate the fact that there's not complete recognition of a genuine willingness to settle on the part of the creditor."

When defense counsel continued to argue that there was a settlement, the court threatened to hold him in contempt and stated:

> "THE COURT: I have told you that this matter is not before the Court, that this issue has not been settled.
>
> Until I see a settlement agreement that the parties have agreed on, until counsel for your opponent agrees that it's been settled, there is no settlement."

However, the court did allow the parties to stay the proceedings for seven days, provided that the parties were working toward settlement. Accordingly, while the court denied defendants' motion for a stay as presented, it nevertheless continued the matter to give the parties time to finalize a settlement.[8]

---

[7]Plaintiff's counsel later indicated that Cannon's offer included the statement, "[i]f you agree to stay," which counsel said plaintiff refused to do.

[8]The record shows that the parties never met to discuss settlement during the seven days.

¶ 33    On the same day, the trial court entered a written order denying the section 2-1401 petition, finding that any new evidence of changes to the intercreditor agreement did not affect or alter defendants' obligations under the promissory note or guaranty, as the only change was an increase to the aggregate amount of costs that the senior lender could recover. The court also found that defendants were not diligent in discovering their defense, as defendants had possessed the intercreditor agreement for over 12 years. The court further found that defendants had not established a meritorious defense because defendants lacked standing to enforce the payment priority language set forth in paragraph 2.1 of the intercreditor agreement. Finally, the court found that the changes to the intercreditor agreement did not increase the risk to the guarantors, so as to entitle them to be discharged from their obligations under the guaranty.

¶ 34    These consolidated appeals follow; appeal No. 1-19-0546 is an appeal from the trial court's denial of defendants' section 2-1401 petition, while appeal No. 1-19-0785 is an appeal from the trial court's denial of defendants' motion for a temporary stay.

¶ 35                                ANALYSIS

¶ 36    On appeal, defendants challenge two separate trial court orders. First, they challenge the trial court's denial of their motion for a temporary stay. Second, they challenge the trial court's denial of their section 2-1401 petition. We consider each in turn.

¶ 37                    I. Motion for Temporary Stay

¶ 38    First, defendants claim that the trial court erred in denying their request for a stay based on settlement. While defendants claim that a *de novo* standard of review is appropriate, our courts have consistently found that "[t]he decision to grant or deny a motion to stay will not be overturned unless the court abused its discretion." *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance, Inc.*, 2016 IL App (1st) 161612, ¶ 35; *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 39. "The standard of 'abuse of discretion' is the most deferential standard of review recognized by the law; a decision will be deemed an abuse of discretion only if the decision is 'unreasonable and arbitrary or where no reasonable person would take the view adopted by the circuit court.' " *Pekin Insurance Co. v. St. Paul Lutheran Church*, 2016 IL App (4th) 150966, ¶ 69 (quoting *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 64).

¶ 39    In the case at bar, the trial court denied defendants' motion because it found that they had not established that there was, in fact, a settlement between the parties. The party seeking a stay bears the burden of proving adequate justification for it. *Kaden v. Pucinski*, 263 Ill. App. 3d 611, 615 (1994). Thus, it was defendants' burden to establish that there was a settlement between the parties. Defendants' motion for a stay did not contain any exhibits to support the claim that the parties had agreed to a stay while the details of settlement were finalized. Before the trial court on March 15, 2019, defendants presented several e-mails that they claimed constituted the settlement agreement; these e-mails are not included in the record on appeal.[9]

_____

[9]To the extent that the contents of any of the e-mails differ from what was discussed before the trial court, we note that defendants, as the appellants, bore the burden of providing this court with a sufficiently complete record and that, in the absence of such a record, we must presume that the order

The trial court examined the e-mails and heard arguments from the parties concerning the issue of settlement—defendants claimed that an agreement had been reached, while plaintiff's counsel vehemently disagreed. After considering the evidence and arguments presented, the trial court concluded that no settlement had been reached. From the portions of the e-mails discussed during the hearing, we cannot find that this decision constituted an abuse of discretion.

¶ 40 Defendants are correct that, as with any contract, a settlement agreement does not need to be in writing, so long as there was an offer and acceptance and there was a meeting of the minds as to the terms of the agreement. See *City of Chicago v. Ramirez*, 366 Ill. App. 3d 935, 946 (2006). However, in the case at bar, the trial court found that there was no such meeting of the minds. Defendants insist that the trial court "refused to consider" evidence of the settlement because no written settlement agreement had been executed. This was clearly not the case. Defendants claimed that the settlement was based on the contents of certain e-mails, they presented those e-mails to the trial court, and the trial court had the opportunity to review those e-mails and made its decision based on them and on the arguments of the parties. Moreover, defendants entirely overlook the fact that, despite its denial of their motion, the trial court nevertheless continued the matters before it for seven days, specifically to provide the parties with an opportunity to pursue settlement, which was not accomplished during that time. Accordingly, we can find no error in the trial court's denial of defendants' motion for a stay based on settlement.

¶ 41                                    II. Section 2-1401 Petition

¶ 42 Next, defendants claim that the trial court erred in denying their section 2-1401 petition to vacate the judgment. We discussed the general law applicable to section 2-1401 petitions in reviewing defendants' first petition, and it remains applicable here. Section 2-1401 "provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated 'after 30 days from the entry thereof.' " *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220 (1986) (quoting Ill. Rev. Stat. 1983, ch. 110, ¶ 2-1401(a)). "[A] section 2-1401 petition can present either a factual or legal challenge to a final judgment or order. *** [T]he nature of the challenge presented in a section 2-1401 petition is critical because it dictates the proper standard of review on appeal." *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. Where the petition raises a factual challenge, as in the case at bar,

> "[t]o be entitled to relief under section 2-1401, the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief." *Airoom*, 114 Ill. 2d at 220-21.

"The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence." *Airoom*, 114 Ill. 2d at 221.

¶ 43 "Whether a section 2-1401 petition should be granted lies within the sound discretion of the circuit court, depending upon the facts and equities presented." *Airoom*, 114 Ill. 2d at 221. "In reviewing discretionary rulings by the trial court, an appeals court must look to the criteria

---

entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

on which the trial court should rely to determine if the trial court abused its discretion." (Internal quotation marks omitted.) *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006).

> " '[A] trial court abuses its discretion if it fails to apply the proper criteria when it weighs the facts,' and a reviewing court 'must consider both the legal adequacy of [the] way the trial court reached its result as well as whether the result is within the bounds of reason.' " *Paul*, 223 Ill. 2d at 99 (quoting *People v. Ortega*, 209 Ill. 2d 354, 360 (2004)).

¶ 44        In the case at bar, plaintiff first raises a number of procedural challenges to defendants' section 2-1401 petition, namely, *res judicata*, collateral estoppel, and judicial estoppel. A prior judgment may have preclusive effect in a subsequent action under both *res judicata* and collateral estoppel. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 389 (2001). " 'The doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action.' " *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008) (quoting *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 334 (1996)). *Res judicata* bars relitigation of matters that were actually decided in the first lawsuit, as well as matters that could have been decided in that suit. *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 302 (1998).

¶ 45        By contrast,

> "[t]he doctrine of collateral estoppel applies when a party, or someone in privity with a party, participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." *Nowak*, 197 Ill. 2d at 389-90.

However, unlike with *res judicata*, the judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined, not as to other matters that *might* have been litigated and determined. *Nowak*, 197 Ill. 2d at 390.

¶ 46        We first consider plaintiff's arguments concerning *res judicata*. Three requirements must be satisfied for *res judicata* to apply: (1) a final judgment on the merits has been reached by a court of competent jurisdiction, (2) an identity of cause of action exists, and (3) the parties or their privies are identical in both actions. *Hudson*, 228 Ill. 2d at 467 (citing *Downing v. Chicago Transit Authority*, 162 Ill. 2d 70, 73-74 (1994)).

¶ 47        Here, the parties do not dispute that the trial court's prior order denying defendants' first section 2-1401 petition was a final judgment on the merits and that the parties are identical in both actions. The only question is whether there is an identity of cause of action. "[S]eparate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *River Park*, 184 Ill. 2d at 311. The original section 2-1401 petition was based on defendants' claim that paragraph 2.1 of the intercreditor agreement precluded the junior lender from enforcing its promissory note until the senior loan was paid. Defendants also claimed that plaintiff deceptively concealed the existence of the intercreditor agreement from defendants and the court by not attaching it to its complaint or otherwise revealing its existence. Like the first petition, the section 2-1401 petition at issue in the instant appeal also claims that paragraph 2.1 of the intercreditor agreement limited plaintiff's recovery. The instant petition also claimed that the lenders had been deceptive by attaching the original signature page to

version 3 of the intercreditor agreement and that the changes in the agreement increased the risk to the guarantors.

¶ 48 We agree with plaintiff that the claims set forth in the two section 2-1401 petitions arise from the same group of operative facts. Specifically, both focus on the interpretation of paragraph 2.1 of the intercreditor agreement as a meritorious defense, and both allege that plaintiff or its predecessor in interest engaged in deceptive or fraudulent conduct in order to hide the terms of the intercreditor agreement from defendants. The only difference between the two petitions is that the second one raises the issue of the intercreditor agreement having been modified without defendants' knowledge, which defendants claim constitutes newly-discovered evidence that precludes the applicability of *res judicata*.

¶ 49 " 'The rule in Illinois is that *res judicata* extends only to the facts and conditions as they were at the time a judgment was rendered. When new facts or conditions intervene before a second action, establishing a new basis for the claims and defenses of the parties respectfully, the issues are no longer the same, and the former judgment cannot be pleaded as a bar in a subsequent action.' " *In re Estate of Brown*, 2014 IL App (1st) 122857, ¶ 25 (quoting *Northern Illinois Medical Center v. Home State Bank of Crystal Lake*, 136 Ill. App. 3d 129, 144 (1985)). In the case at bar, however, the record establishes that evidence of the multiple versions of the agreement was available before the time that judgment was entered on the initial petition.

¶ 50 First, the intercreditor agreement that defendants had in their possession since 2006 listed two different version numbers on its face, meaning that, if they had looked closely, defendants could have observed that the number on the substantive portion of the agreement did not match the number on the signature page. Even putting aside that technicality, however, defendants indisputably became aware of the different versions of the intercreditor agreement on November 21, 2017, the day before the hearing on the initial section 2-1401 petition. Defendants' counsel specifically referenced the e-mails between Amcore Bank and Horizon Farms during the hearing, and the record is replete with references to November 21, 2017, as the date that defendants became aware of the e-mails. Despite this knowledge, defendants did not seek a continuance or otherwise seek to amend or supplement their initial petition with the additional facts that had become known to them. Indeed, the trial court even asked defense counsel at the beginning of the November 22 hearing whether the defense wished to proceed on plaintiff's motion to dismiss or wished to file a response, suggesting that the trial court would have been receptive to a continuance. Thus, while the facts were not known to defendants until after the *filing* of the initial section 2-1401 petition, they were known to defendants prior to the time the trial court *ruled* on the petition.

¶ 51 "When *res judicata* is established as a bar against the prosecution of a second action between the same parties upon the same claim or demand it is conclusive not only as to every matter which *was* offered to sustain or defeat the claim or demand, but as to any other matter which *might* have been offered for that purpose." (Emphases in original.) *Nowak*, 197 Ill. 2d at 389 (citing *Housing Authority for La Salle County v. Young Men's Christian Ass'n of Ottawa*, 101 Ill. 2d 246, 251-52 (1984)). Here, defendants' claims could have been raised in their original section 2-1401 petition; therefore, *res judicata* applies to bar defendants' claims in the second petition.

¶ 52 However, even if the claims were not barred, we would not be able to find that the trial court abused its discretion in denying the section 2-1401 petition. As noted,

- 14 -

"[t]o be entitled to relief under section 2-1401, the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for relief." *Airoom*, 114 Ill. 2d at 220-21.

In the case at bar, the trial court did not find that any of these elements were satisfied.

¶ 53     With respect to the issue of diligence, to prevail on a section 2-1401 petition, the petitioner must affirmatively set forth specific factual allegations supporting both the petitioner's "due diligence in presenting [a meritorious] defense or claim to the circuit court in the original action; and *** due diligence in filing the section 2-1401 petition for relief." *Airoom*, 114 Ill. 2d at 220-21. "No bright-line rule exists for judging whether a petitioner has acted diligently. Rather, due diligence is judged by the reasonableness of the petitioner's conduct under all of the circumstances." *Paul*, 223 Ill. 2d at 99-100.

¶ 54     In the case at bar, we agree with the trial court that defendants did not act with due diligence in presenting their section 2-1401 petition to the court. As noted, defendants first discovered that there were multiple versions of the intercreditor agreement on November 21, 2017. However, they did not file their section 2-1401 petition until February 1, 2019, over 14 months later. Defendants attempt to justify this delay by pointing to the fact that they needed to conduct depositions of authors of the e-mails and needed time to draft their petition. However, this argument glosses over defendants' actions during this 14-month time frame. Defendants conducted the deposition of Wilson on February 28, 2018, and the deposition of Gudmundson on March 21, 2018. More importantly, by March 8, 2018, defendants had sufficient knowledge of the facts underlying the different versions of the intercreditor agreement that they filed a motion to dismiss in the foreclosure action, based on the same arguments they raise in the instant section 2-1401 petition. Thus, the same arguments that defendants claim required 14 months to develop here were first presented to a different trial court 11 months earlier. Indeed, they had been *rejected* by that trial court 11 months before the filing of the section 2-1401 petition. Consequently, we cannot find that the trial court abused its discretion in finding that defendants had failed to satisfy the due diligence requirement.

¶ 55     Since defendants have failed to establish one of the requirements for vacating the judgment, we have no need to consider whether they also failed to establish that they had a meritorious defense to the underlying action or whether they established due diligence in discovering their defense.

¶ 56                                                    CONCLUSION

¶ 57     For the reasons set forth above, we affirm the trial court's judgment. First, the trial court properly denied defendants' motion for a temporary stay, where there was no evidence of a settlement having been reached. Second, the trial court properly dismissed defendants' section 2-1401 petition, where the claims in the petition were barred by *res judicata* and where defendants did not act with due diligence in presenting their petition to the trial court.

¶ 58     Affirmed.